432 F.2d 466
 NORTH DENVER BANK, Plaintiff, and National Union Fire Insurance Company of Pittsburgh, Pennsylvania, Great American Insurance Company, and Scott H. Mabry, Ancillary Administrator for the Estates of William F. Van Winkle and Dorothy E. Van Winkle, formerly doing business as Van Winkle Construction Company, Third-Party Plaintiffs
v.
The UNITED STATES.
 No. 210-67.
 United States Court of Claims.
 October 16, 1970.
 
 William Hedges Robinson, Jr., Lakewood, Colo., attorney of record, for plaintiff; Randall B. Robinson and Robinson, Tilton & Robinson, Denver, Colo., of counsel.
 Edward Gallagher, Washington, D. C., attorney of record, for third-party plaintiffs.
 Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.
 OPINION
 PER CURIAM:
 
 
 1
 This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference, Rule 134(h) and the order entered herein on February 28, 1969. The commissioner has done so in an opinion and report filed on March 30, 1970. Exceptions and brief were filed by the third-party plaintiff, Great American Insurance Company, on April 29, 1970. Exceptions and brief were filed by the North Denver Bank on May 15, 1970 and a reply thereto was filed by defendant on May 28, 1970. On May 28, 1970 the court granted a motion for submission of the case to the court without oral argument and the case has been so submitted. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, the court concludes as a matter of law that the third-party plaintiffs National Union Fire Insurance Company of Pittsburgh, Pennsylvania, and Great American Insurance Company are entitled to recover, and it is therefore adjudged and ordered that the third-party plaintiff National Union Fire Insurance Company of Pittsburgh, Pennsylvania, recover of and from the United States the sum of sixty-five thousand three hundred ninety-eight dollars and seventy cents ($65,398.70), and that the third-party plaintiff Great American Insurance Company recover of and from the United States the sum of thirty-four thousand eighty dollars and fifty cents ($34,080.50): Provided, however, That the recovery by Great American Insurance Company is conditioned upon the filing with the Clerk of the Court, within 30 days after the date on which judgment is entered, of receipts from all the claimants listed in finding 41, showing payment in full by Great American Insurance Company of their respective claims against Van Winkle Construction Company.
 
 
 2
 The court further concludes as a matter of law that the plaintiff North Denver Bank and the third-party plaintiff Scott H. Mabry, ancillary administrator for the estates of William F. Van Winkle and Dorothy E. Van Winkle, formerly doing business as Van Winkle Construction Company, are not entitled to recover, and their petitions are dismissed as of the date on which the conditional judgment in favor of Great American Insurance Company becomes final.
 
 OPINION OF COMMISSIONER
 WHITE, Commissioner:
 
 3
 In this case, the plaintiff and the third-party plaintiffs are engaged in a contest over the proceeds from two construction contracts which the defendant entered into in 1964 and 1965 with the late William F. Van Winkle and the late Dorothy E. Van Winkle ("the Van Winkles"), who were doing business as partners under the name of Van Winkle Construction Company ("the contractor").
 
 
 4
 The defendant concedes that it owes money to some person or persons under each of the two contracts.
 
 
 Introductory Statement
 
 
 5
 The plaintiff is a bank which loaned money to the contractor; two of the third-party plaintiffs are surety companies which furnished performance and payment bonds to the defendant in connection with the respective contracts; and the other third-party plaintiff is an ancillary administrator of the Van Winkles' estates.
 
 
 6
 One of the contracts — which will usually be referred to in the opinion as "the Chama contract" — was entered into between the contractor and the defendant (represented by the Forest Service, Department of Agriculture) on October 20, 1964. It obligated the contractor to clear, grade, and drain approximately 7.766 miles of the Chama Road in the Rio Grande National Forest, Archuleta County, Colorado, and Rio Arriba County, New Mexico, for a contract price of $98,214.30.
 
 
 7
 The third-party plaintiff National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"), furnished a performance bond and a payment bond to the defendant in connection with the Chama contract. Both bonds were dated October 20, 1964.
 
 
 8
 The North Denver Bank ("the plaintiff") made a loan to the contractor on March 30, 1965, in order to help finance the contractor's operations under the Chama contract. This loan was secured by an assignment from the contractor to the plaintiff of all sums that might be payable to the contractor under the Chama contract.
 
 
 9
 The other contract — which will usually be referred to hereafter as "the Dome contract" — was entered into between the contractor and the defendant (again represented by the Forest Service) on June 7, 1965. It obligated the contractor to clear, grade, drain, and surface approximately 2.1 miles of Dome Road No. 10289 in the Santa Fe National Forest, Sandoval County, New Mexico, for a contract price of $43,000.
 
 
 10
 The third-party plaintiff Great American Insurance Company ("Great American") furnished performance and payment bonds to the defendant in connection with the Dome contract. Both bonds were dated June 7, 1965.
 
 
 11
 The plaintiff on August 20, 1965, provided financing to the contractor in connection with the latter's operations under the Dome contract. This loan was secured by an assignment from the contractor to the plaintiff of all amounts that might become due under the Dome contract.
 
 
 12
 The Van Winkles died on November 20, 1965, as the result of an airplane crash. At that time, the work under the Dome contract had recently been completed, but only about 45 percent of the work under the Chama contract had been done. The Chama contract was subsequently completed by National Union pursuant to its obligation under the performance bond.
 
 
 13
 Amounts earned under the two contracts are being held by the defendant because of uncertainty as to the proper recipients.
 
 
 14
 The plaintiff's petition was filed on June 23, 1967; and the third-party plaintiffs filed their petitions on October 30, 1967. Thereafter, motions for summary judgment were filed by the third-party plaintiffs on November 18, 1968.
 
 
 15
 In disposing of the motions for summary judgment, the court on February 28, 1969, established the following order of priority among the third-party plaintiffs and the plaintiff with respect to the amounts due from the defendant under the two contracts that are involved in the case:
 
 
 16
 (1) the respective third-party sureties, but this top priority in the case of the Great American Insurance Company was granted subject to the condition that "the surety shall furnish proof that it has paid labor and materialmen now unpaid the entire amounts due them, without regard to the maximum penalty under its bond";
 
 
 17
 (2) the plaintiff bank; and
 
 
 18
 (3) the third-party ancillary administrator.
 
 
 19
 The case was remanded to the commissioner for a determination respecting the amounts due the several claimants under the court's order.
 
 
 20
 Subsequently, trial sessions were held in Denver, Colorado, and in Albuquerque, New Mexico, during the period July 8-14, 1969.
 
 
 The Chama Contract
 
 
 21
 A controversy exists between the defendant and the other parties over the amount that is due from the defendant under the Chama contract. The defendant contends that the proper amount is $65,398.70, whereas the other parties argue that the proper amount is $70,573.70.
 
 
 22
 The difference of $5,175 between the two figures mentioned in the last sentence of the preceding paragraph represents a deduction for liquidated damages in the amount of $5,175 which the defendant says it is entitled to make because the work under the Chama contract was not completed within the time prescribed by the contract.
 
 
 23
 The Chama contract provided that the work was to be completed within 180 calendar days after the date of the receipt by the contractor of the notice to proceed with the work. The notice to proceed was received by the contractor on November 9, 1964. Thus, the 180-day period prescribed for the completion of the work began to run on November 10, 1964.
 
 
 24
 Paragraph 6.8 of the general requirements of the Chama contract provided that in the event of a failure to complete the work within the time prescribed by the contract, a daily charge for liquidated damages at the rate of $75 per day would be made for each calendar day of delay until the work was completed.
 
 
 25
 However, paragraph 5(d) of the general provisions of the Chama contract stated that damages should not be assessed against the contractor for delay attributable to "unforeseeable causes beyond the control and without the fault or negligence of the Contractor," provided the contractor gave the contracting officer a written notice within 10 days after encountering such an unforeseeable cause of delay.
 
 
 26
 Also, paragraph 6.7 of the general requirements of the Chama contract provided that the defendant's Forest Engineer (who was the contracting officer's representative at the job site) might, by written notice, order suspension of the work for any period that he might deem necessary because of unsuitable weather, and that no charge should be made against the contract time for any days elapsing during such a suspension.
 
 
 27
 Up to the time of the Van Winkles' death on November 20, 1965, no request for an extension of the 180-day period fixed in the Chama contract for the completion of the work had been made by the contractor on the ground of excusable delay under paragraph 5(d) of the general provisions of the contract; and no such request for a time extension was made after the Van Winkles' death by the administrator of their estates or by National Union. However, the work had been suspended twice as of November 20, 1965, pursuant to paragraph 6.7 of the general requirements due to adverse weather conditions. These work suspensions covered the periods November 14-30, 1964, and December 4, 1964-May 31, 1965. They were ordered by the Forest Engineer after consultation with the contractor and in agreement with the contractor. Such periods of suspension were not charged against the 180 days which the contract allowed for the completion of the work.
 
 
 28
 The 180-day period for the completion of the work under the Chama contract, as adjusted on the basis of the work suspensions mentioned in the preceding paragraph, expired at the close of November 20, 1965, which was the date on which the Van Winkles were killed in an airplane crash. At the close of the next day, November 21, the work was again suspended because of adverse weather conditions. This work suspension continued through the period November 22, 1965-June 5, 1966.
 
 
 29
 During the work suspension mentioned in the last sentence of the preceding paragraph, the contracting officer ascertained from the administrator of the Van Winkles' estates that their heirs did not intend to do any further work under the Chama contract. The contracting officer then made arrangements with National Union whereby the latter undertook to complete the contract work. National Union was obligated by a performance bond in the penal sum of $98,214.30.
 
 
 30
 The work under the Chama contract was resumed by National Union (through a company operating under the name of Earl Troop Contractor) on June 6, 1966. The work was completed on August 12, 1966, which was 68 days after the work was resumed on June 6, 1966.
 
 
 31
 It has previously been indicated that the 180-day period prescribed by the Chama contract for the completion of the work, as adjusted for work suspensions due to adverse weather conditions, expired at the close of November 20, 1965. That was the day on which the Van Winkles were killed in an airplane crash. The 69 days of delay for which the defendant asserts the alleged right to assess liquidated damages consist of November 21, 1965 — the day after the Van Winkles' death and the day before the final work suspension due to adverse weather conditions became effective — and of the 68 days in June, July, and August of 1966 during which the work was being completed by National Union.
 
 
 32
 The position of the plaintiff and the third-party plaintiffs to the effect that the defendant is not authorized to assess liquidated damages in this case seems to be based, first, upon the view that the death of the Van Winkles in an airplane crash was unforeseeable and, therefore, was an excusable cause of delay. There is a fatal flaw in this proposition, arising from the circumstance that there is no evidence in the record indicating that the delay in completing the Chama contract was attributable in any degree to the Van Winkles' death. On the contrary, the evidence indicates that the actual delay occurred prior to the Van Winkles' death. Although the 180-day period prescribed by the contract for the completion of the work expired at the close of the day on which the Van Winkles were killed, the contractor had completed only about 45 percent of the work as of that date. The contractor's unsatisfactory progress was due principally to the lack of adequate supervision on the job. The Forest Engineer, who was the contracting officer's representative at the job site, had often admonished the contractor regarding its unsatisfactory progress. By contrast, National Union (acting through Earl Troop Contractor) was able to complete within 68 days the remaining 55 percent of the work left unfinished by the contractor at the end of 181 days (including November 21, 1965).
 
 
 33
 Furthermore, if the Van Winkles' death had actually been a cause of delay in the completion of the contract, it would have been necessary for their representative, or for National Union as their surety, to notify the contracting officer in writing within 10 days that the Van Winkles' death was regarded as an unforeseeable cause of delay, warranting an extension of the 180-day period prescribed in the Chama contract for the completion of the work. This was not done.
 
 
 34
 The plaintiff and the third-party plaintiffs contend, further, that in view of the Van Winkles' death just prior to the expiration of the 180-day period prescribed for the completion of the work under the Chama contract, it cannot be said that the Van Winkles' partnership refused or failed to complete the performance of the contract work. However, the obligation of the Van Winkles' partnership to complete the Chama contract in accordance with its terms did not cease upon the death of the Van Winkles. The administrator of their estates succeeded not only to their rights but also to their obligations under the Chama contract.
 
 
 35
 In connection with this particular point, it is pertinent to note that the contracting officer, upon learning that an administrator had been appointed for the Van Winkles' estates, called the administrator on the telephone and discussed with him the matter of completing the work under the Chama contract. The administrator informed the contracting officer that, under the circumstances, the Van Winkles' family did not intend to do any further work on the Chama job. The contracting officer thereupon asked the administrator to confirm this in writing, and the administrator did so in a letter dated January 12, 1966. The contracting officer then wrote a letter to the administrator on January 18, 1966, informing the administrator that the contractor's right to proceed under the Chama contract had been terminated for default.
 
 
 36
 Another contention made by the plaintiff and the third-party plaintiffs is to the effect that upon the Van Winkles' death, their partnership ceased to exist as a legal entity, and thereafter it was "legally impossible" to invoke the liquidated damages provisions of the contract against the partnership as the original contractor. The answer to this contention is that, as previously indicated, the administrator of the Van Winkles' estates succeeded both to their rights and to their obligations under the Chama contract, including the obligation to complete the work under the contract within 180 days or pay liquidated damages at the daily rate of $75 for each day of delay beyond the 180-day period.
 
 
 37
 In addition, the plaintiff and the third-party plaintiffs argue that the assessment of liquidated damages for 68 days of delay while National Union was completing the contract is unjustified, since there is no showing in the record that the contractor would have required 68 additional days to complete the job. With respect to this argument, it is sufficient to say that the only reasonable inference to be drawn from the evidence in the record is that the contractor — which completed only about 45 percent of the work in a total of 181 days — would certainly have taken at least 68 days to complete the remaining 55 percent of the work. Furthermore, as previously stated, the administrator of the Van Winkles' estates, who succeeded to the rights and obligations of the original partnership-contractor, declined to complete the work under the contract.
 
 
 38
 Finally, the plaintiff and the third-party plaintiffs contend that since there was no formal assessment of liquidated damages prior to the filing of the present court action, there has been a waiver by the defendant of its right to assess liquidated damages. However, these parties do not attempt to show that they have been prejudiced in any way by the defendant's failure to make a formal assessment of liquidated damages prior to the institution of the suit. Furthermore, the provisions of the contract relating to the assessment of liquidated damages did not, either expressly or by implication, require that the defendant make a formal assessment of liquidated damages prior to the time of the final settlement under the contract.
 
 
 39
 In his oral negotiations with National Union regarding the completion of the work under the Chama contract, the contracting officer consistently took the position that the assessment of liquidated damages would be necessary because of the failure to complete the work within the 180-day period prescribed by the contract, as adjusted on account of work suspensions due to adverse weather conditions. National Union disagreed with the contracting officer concerning the propriety of the latter's position, but, at any rate, National Union was well aware of the defendant's intention to assess liquidated damages.
 
 
 40
 It is concluded that the defendant is entitled to deduct, from the $70,573.70 otherwise due under the Chama contract, liquidated damages in the amount of $5,175 because of the failure to complete the contract within the 180-day period prescribed by the contract, as adjusted for work suspensions due to adverse weather conditions. There were 69 days of delay beyond the 180-day period, and liquidated damages were chargeable at the rate of $75 a day.
 
 
 41
 Thus, the amount properly due from the defendant under the Chama contract is $65,398.70, as contended by the defendant, rather than $70,573.70, as contended by the other parties.
 
 
 42
 The evidence in the record shows that National Union expended $74,840.70 in completing the Chama contract pursuant to the surety's obligation under its performance bond.[1] Since the amount due from the defendant under the Chama contract is only $65,398.70, National Union is entitled to a judgment for this entire amount in accordance with the surety's top priority pursuant to the court's order of February 28, 1969.
 
 
 The Dome Contract
 
 
 43
 The work under the Dome contract was completed by the contractor on November 11, 1965, which was nine days before the Van Winkles were killed in an airplane crash.
 
 
 44
 All the parties are in agreement that the amount due from the defendant under the Dome contract is $34,080.50.
 
 
 45
 In connection with the Dome contract, Great American furnished to the defendant a performance bond in the penal sum of $43,000 and a payment bond in the penal sum of $21,500.
 
 
 46
 It was not necessary for Great American to expend any money in discharging its performance bond obligation, because the work under the Dome contract was completed by the contractor. On the other hand, as of the time of the trial in July of 1969, Great American had paid out a total of $21,132.42 in discharging its obligation under the payment bond. This total amount was paid by Great American to persons who had furnished labor or materials to the contractor in connection with the performance of the Dome contract. As previously indicated, Great American's payment bond imposed a maximum obligation of $21,500 on the surety.
 
 
 47
 Evidence received at the trial in July of 1969 showed that, at such time, persons who had furnished labor or materials to the contractor in connection with the performance of the Dome contract still had unpaid claims against the contractor totaling $15,435.77.
 
 
 48
 The court's order of February 28, 1969, stated that Great American's top priority in the distribution of the proceeds from the Dome contract was granted subject to the condition that "the surety shall furnish proof that it has paid labor and materialmen now unpaid the entire amounts due them, without regard to the maximum penalty under its bond." As indicated in the preceding paragraph, it was revealed at the trial that Great American had failed, as of that time, to fulfill the required condition.
 
 
 49
 However, the condition previously quoted was designed primarily to obtain the payment of the unpaid claims of persons who had furnished labor or materials to the contractor in connection with the performance of the Dome contract, rather than to establish a predicate for perhaps depriving Great American of its priority. Accordingly, it would seem appropriate to enter a judgment for Great American in the sum of $34,080.50, conditioned upon the filing with the clerk of the court, within 30 days after the judgment is entered, of receipts from all the claimants listed in finding 41, showing payment in full by Great American of their respective claims against the contractor.
 
 
 50
 The payment by Great American of the unpaid claims, added to the amounts already expended by Great American under its payment bond, would mean a total expenditure of $36,568.19 by Great American.
 
 
 
 Notes:
 
 
 [1]
 In addition, National Union expended, pursuant to the terms of its payment bond, $26,299.45 on labor and material bills incurred by the contractor. Thus, the total amount expended by National Union under its performance and payment bonds pertaining to the Chama contract was $101,140.15