**AMERICAN FIDELITY FIRE INSURANCE CO.**

v.

**The UNITED STATES**

v.

**Ernst H. BRANDT, III, Third-Party.**

**No. 176–73.**

United States Court of Claims.

April 16, 1975.

Kent Leeds Vallette, Beverly Hills, Cal., attorney of record, for plaintiff.

Bernard M. Brodsky, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, New York City, for defendant. Leslie H. Wiesenfelder, Washington, D. C., of counsel.

Ernst H. Brandt, III, third party, pro se.

Before DAVIS, KASHIWA and KUNZIG, Judges.

KASHIWA, Judge.

This is a suit seeking reimbursement from the Government of payment of $15,900 made by plaintiff surety to a subcontractor on a payment bond. The plaintiff surety and the Government are here on cross motions for summary judgment. For the reasons stated below, we hold that the plaintiff surety may recover $14,055.40, the amount the Government paid the contractor, but not the retainage of $1,990.72 withheld by the Government. We further hold for the Government and against the contractor who is a third-party defendant herein in the amount of $14,055.40.

Contract N62474–72–C–6604 was awarded on November 1, 1971, by the Department of the Navy to Ernst H. Brandt, III, d/b/a Variant Mechanical Contractors (hereinafter referred to as Variant or contractor) for Interim Repairs to Refractory in Boilers 48 and 50, Building 653, Naval Air Station, North Island, San Diego, California. The total amount of the contract was $15,900 which was later increased to $16,046.12. Pursuant to the Miller Act, 40 U.S.C. §§ 270a–270d (1970), amending 49 Stat. 793–794 (1935), plaintiff surety on November 22, 1971, executed a performance bond for $15,900 and a payment bond for $7,950. On February 14, 1972, Variant subcontracted the entire work to Marine

Boiler Repair, Inc. (hereinafter referred to as Marine Boiler). On March 9, 1972, the Government informed Variant that the work was complete and that it was accepted as of March 3, 1972.

On April 21, 1972, the Government received a letter from the plaintiff surety dated April 19, 1972, demanding that any monies due under the contract be distributed to and placed with plaintiff surety. The text of the letter appears below.[1] On May 3, 1972, the Government responded and stated that it could not comply with plaintiff surety's request. The Government's reply letter appears below.[2]

On May 12, 1972, the Government made a partial payment of $14,055.40 to Variant. No other sums have been disbursed under this contract. On May 16, 1972, Marine Boiler presented its claim to plaintiff surety for $16,220 for its performance of the work. Ernst H. Brandt,

III, d/b/a Variant Mechanical Contractors, filed a petition in bankruptcy on June 26, 1972, and received a discharge in bankruptcy on October 30, 1972. On August 9, 1972, and on January 1, 1973, plaintiff surety made payments to Marine Boiler totaling $15,900. On November 2, 1972, Variant's trustee in bankruptcy requested that the Government pay to him as trustee the contract retainage of $1,990.72. The trustee has not filed a third-party petition asserting a claim to the $1,990.72.

On March 28, 1973, plaintiff sued Marine Boiler in California Superior Court to recover $7,950 of the $15,900 paid on the ground that plaintiff only intended to pay the $7,950 penal amount of the performance bond, the excess of $7,950 having been paid by mistake.[3] The case is still pending in the California Superior Court. On June 18, 1973, plaintiff surety filed its petition in this court. On September 6, 1973, the Government filed

1. Letter dated April 19, 1972, addressed to Navy Public Works Center, P.O. Box 113, Naval Station, San Diego, California 92136, from American Fidelity Fire Insurance Company:

"In reference to the above captioned matter and pursuant to that General Agreement of Indemnity as between American Fidelity Fire Insurance Company and Ernst Brandt of Variant Mechanical Contractors, a copy of which is attached hereto, and further pursuant to California Code of Civil Procedure, Section 2847, 2848 and 2849, please consider this letter formal demand that any monies due under the above captioned contract be forthwith distributed to and placed with American Fidelity Fire Insurance Company."

2. Letter dated May 3, 1972, addressed to American Fidelity Fire Insurance Co., 864 So. Robertson Blvd., Los Angeles, California 90035, from Stuart R. Footz, Counsel, for Navy:

"This is a response to your letter of April 19, 1972 addressed to the Navy Public Works Center, San Diego, California which states that it is a formal demand that any monies due to the prime contractor, Variant Mechanical Contractors, under the subject contract be forthwith distributed to and placed with American Fidelity Fire Insurance Company.

"The reason the Navy cannot comply with your request is explained in a Decision of the Comptroller General of the United States dated January 14, 1970, a copy of which is enclosed. Under the rule set forth in this decision all money in excess of retainages are

properly payable to prime contractors in accordance with the contract terms without the necessity of first securing the surety's agreement. Furthermore, your General Agreement of Indemnity cannot be treated as an assignment under the Federal Assignment of Claims Statutes, 31 U.S.C. § 203, 41 U.S.C. § 15, because you are not a bank, trust company or other financial institution.

"Many sureties make it a practice to protect their interests when a contractor is in financial difficulties by having the contractor write a letter to the Officer in Charge of Construction instructing him to mail all checks payable to the contractor to an address which is care/of the bonding company. This enables the bonding company to insure that the contract proceeds are used for proper purposes such as the payment of subcontractors, materialmen, and laborers. Enclosed for your information is a sample of this type of instruction.

"In any event, checks for contract proceeds in excess of retainages must be made payable to the contractor, and even the retainages can only be paid in accordance with an agreement of all parties such as the surety, contractor assignee, if any, or other persons having an interest in the matter or as a court order may dictate.

"With respect to the subject contract you are advised that there will be a charge by the Government for liquidated damages inasmuch as the contract was not completed on time."

3. See footnote 5 regarding this mistaken payment.

in this case its contingent cross claim against Ernst H. Brandt, III, d/b/a Variant Mechanical Contractors, and the trustee of his estate in bankruptcy.[4]

The questions involved herein are the following: (1) Does plaintiff surety have standing to sue? (2) Was plaintiff surety's notice of April 19, 1972, to the Government such that it made the Government a stakeholder so that the subsequent payment of $14,055.40 by the Government to the contractor was illegal? (3) Is plaintiff surety entitled to recover the retainage of $1,990.72? (4) Are the contractor and the trustee in bankruptcy liable to the Government to the extent plaintiff surety is entitled to recovery?

■ The question of standing to sue is raised by the Government because of the rule that in order for a surety to share in the fund unexpended under the contract, it must first pay all of the claims of the laborers and materialmen. Great American Insurance Co. v. United States, 492 F.2d 821, 824, 203 Ct.Cl. 592, 598 (1974); United States Fidelity & Guaranty Co. v. United States, 475 F.2d 1377, 1381, 201 Ct.Cl. 1, 8 (1973); American Surety Co. v. Westinghouse Electric Manufacturing Co., 296 U.S. 133, 137, 56 S.Ct. 9, 80 L.Ed. 105 (1935); North Denver Bank v. United States, 432 F.2d 466, 469, 193 Ct.Cl. 225, 230 (1970). The principle is well stated at page 137 of 296 U.S., 56 S.Ct. 11 of *American Surety Co., supra:*

> Liability to pay was ended, but equities growing out of the suretyship relation survived in undiminished force. Acquittance under the bond did not leave the surety at liberty to prove against the assets of the insolvent principal on equal terms with the materialmen, still less to go ahead of them. The settled principles of the

law of suretyship forbid that competition. Jenkins v. National Surety Co., 277 U.S. 258, 266, 48 S.Ct. 445, 12 L.Ed. 874. A surety who has undertaken to pay the creditors of the principal, though not beyond a stated limit, may not share in the assets of the principal by reason of such payment until the debts thus partially protected have been satisfied in full. This is the rule where the right to a dividend has its basis in the principle of equitable subrogation. "A surety liable only for part of the debt does not become subrogated to collateral or to remedies available to the creditor unless he pays the whole debt or it is otherwise satisfied." United States v. National Surety Co., 254 U.S. 73, 76, 41 S.Ct. 29, 30, 65 L.Ed. 143 * * * [Footnote omitted.]

In this case the total claim of Marine Boiler was $16,220 and plaintiff surety paid $15,900; therefore, the excess claim over the amount received by the subcontractor is $320.[5] Since the amount is so minor, we assume that plaintiff surety will forthwith pay the same to Marine Boiler. We shall condition the recovery by plaintiff surety upon the filing with the Clerk of this court evidence of payment to Marine Boiler of the said $320. A similar conditional method was adopted by this court in *North Denver Bank, supra,* 432 F.2d at 467, 193 Ct.Cl. at 227–228.

■ We now turn to the main question of the liability of the Government to plaintiff surety for the payment of $14,055.40 made to the contractor after the Government received notice from plaintiff surety. Plaintiff surety's letter of April 19, 1972, was a demand that monies due under the contract be "distributed to and placed with American Fidelity Fire Insurance Company." Defendant's response dated May 3, 1972, in-

4. Since the trustee in bankruptcy did not respond to the summons, he is not a third-party defendant but under Rule 41(f) he can be affected by a decision of this court.

5. We do not think that it is relevant here that the $7,950 in excess of the penal amount of

the payment bond was paid by plaintiff surety to the subcontractor by mistake. If only the penal amount of the payment bond were paid, the surety would still have to pay the balance of the subcontractor's $16,220 claim in order to have standing to sue to collect the $14,055.40.

forms the plaintiff that the Navy could not comply with the request. On May 12, 1972, the Government made the payment of $14,055.40 to the contractor.

Several cases of this court have considered the Government's role as a stakeholder. In *Great American Insurance Co., supra,* 492 F.2d at 824–825, 203 Ct.Cl. at 598–599, this court carefully commented on the Government's role as a stakeholder as follows:

> * * * We have repeatedly held that the surety who satisfies the contractor's obligations to pay laborers and materialmen under the payment bond has an equitable interest, superior to the interest of the contractor's assignee or the contractor's trustee in bankruptcy, in the unpaid contract balance held by the Government as a stakeholder. * * *
>
> * * * * * *
>
> * * * As in our previous decisions on this point, we hold that the Government improperly abandoned its role as a stakeholder and elected to decide the merits of the conflicting claims by paying the amount in dispute to the assignee without a valid reason for doing so. * * *

In The Home Indemnity Co. v. United States, 376 F.2d 890, 893–894, 180 Ct.Cl. 173, 178 (1967), this court stated:

> When the contract involved here was completed, the Government was the stakeholder of the final payment or security for which there were two contending claimants, the surety and the contractor. In view of plaintiff's equitable rights in the fund, which were superior to those of the contractor, the Government had no right as a stakeholder to settle the question unilaterally by paying the fund to the contractor. * * * [Footnote omitted.]

The language of this court in Newark Insurance Co. v. United States, 169 F.Supp. 955, 957, 144 Ct.Cl. 655, 658–659 (1959), was more explicit:

> Surely a stakeholder, caught in the middle between two competing claimants, cannot, in effect, decide the merits of their claims by the mere physical act of delivering the stake to one of them. If his position as stakeholder becomes uncomfortable, and the claimants do not take steps to get a judicial solution of the question, the law has provided him with an interpleader proceeding by which he can deposit the stake in court and walk out free of the annoyance of being in the middle.
>
> If it is made to appear that the Government's officials, after due notice of the facts giving rise to an equitable right in the plaintiff surety company, and of the plaintiff's assertion of such a right, paid out, without a valid reason for so doing, the money in question to someone other than the plaintiff, the plaintiff will be entitled to a judgment.

See United States Fidelity & Guaranty Co., *supra;* Fireman's Fund Insurance Co. v. United States, 421 F.2d 706, 190 Ct.Cl. 804 (1970); National Surety Corp. v. United States, 319 F.Supp. 45 (N.D. Ala.1970); Argonaut Insurance Co. v. United States, 434 F.2d 1362, 193 Ct.Cl. 483 (1970).

We have to then determine whether the Government was a stakeholder under the circumstances of this case. With relation to the letter of April 19, 1972, the Government argues that plaintiff surety's letter did not provide the Government with any information to justify it in not paying the contractor and that the letter was so worded that plaintiff surety was demanding that it be paid rather than merely requesting that the money be withheld. The Government also argues that there is nothing in plaintiff surety's letter showing that plaintiff surety had reason to believe that the contractor would not pay Marine Boiler. The Government further argues that until the Government paid the contractor, the contractor would not have funds to pay Marine Boiler.

In answer to all of the above arguments, we point out that plaintiff surety's letter of April 19, 1972, specifically refers to the following sections of the

California Civil Code: §§ 2847, 2848 and 2849. We set the sections out below because we deem the reference to the sections very pertinent.[6] All of the sections are pertinent in situations when a principal on a bond, the contractor in this case, fails to pay laborers and materialmen or is in such a condition that he appears unable to pay. None of the sections has any application unless there is a defaulting principal or one who is about to default. Once there is a default by the principal, the sections provide in the surety's favor suitable rights including subrogation. In other words, reference to these sections of the California Civil Code coupled with the demand of the plaintiff surety was a caveat that a situation was arising wherein the contractor may default and plaintiff surety wanted to preserve its right of subrogation. We do not mean that these California Civil Code sections are controlling in this case, but we refer to them because they clearly show what the sender intended to say if the recipient of the letter looked up these Code sections. Danger signals were apparent if the recipient examined these Code sections because they all dealt with defaulting principals.

The Government, in its letter of May 3, 1972, in addition to notifying plaintiff surety that the Navy cannot comply with its request, states as follows:

Many sureties make it a practice to protect their interests when a contractor is in financial difficulties by having the contractor write a letter to the Officer in Charge of Construction instructing him to mail all checks payable to the contractor to an address which is care/of the bonding company. This enables the bonding company to insure that the contract proceeds are used for proper purposes such as the payment of subcontractors, materialmen, and laborers. Enclosed for your information is a sample of this type of instruction.

The above paragraph indicates that the Government at least was aware that something was amiss.

The Government's letter to plaintiff surety was dated May 3, 1972. Its payment to the contractor was on May 12, 1972. Allowing two days for plaintiff surety to receive the letter, two days for the weekend, and two days for a response to reach the Government, this leaves only three days for plaintiff surety to have an instruction letter from the contractor sent to the Government. This is too short a time under the circumstances.

We hold that under all the circumstances aforementioned the Government became a stakeholder. Once it becomes a stakeholder, its duties are well defined in the three cases, *Great American In-*

---

**6.** Although the letter in fact refers to "California Code of Civil Procedure," since that code ends before reaching sections with the mentioned numbers and since the California Civil Code includes sections numbered as mentioned in the letter which are pertinent, we assume that the California Civil Code is what was meant by the reference to "California Code of Civil Procedure."

"§ 2847. Reimbursement of surety by principal

"*A Principal Bound To Reimburse His Surety.* If a surety satisfies the principal obligation, or any part thereof, whether with or without legal proceedings, the principal is bound to reimburse what he has disbursed, including necessary costs and expenses; but the surety has no claim for reimbursement against other persons, though they may have been benefited by his act, except as prescribed by the next section.

"§ 2848. Subrogation of surety to creditor's rights

"*The Surety Acquires The Right Of The Creditor.* A surety, upon satisfying the obligation of the principal, is entitled to enforce every remedy which the creditor then has against the principal to the extent of reimbursing what he has expended, and also to require all his co-sureties to contribute thereto, without regard to the order of time in which they became such.

"§ 2849. Surety entitled to benefits of securities for performance

"*Surety Entitled To Benefit Of Securities Held By Creditor.* A surety is entitled to the benefit of every security for the performance of the principal obligation held by the creditor, or by a co-surety at the time of entering into the contract of suretyship, or acquired by him afterwards, whether the surety was aware of the security or not."

surance Co., supra; The Home Indemnity Co., supra; and Newark Insurance Co., supra. Under the circumstances of this case, we hold the Government liable to plaintiff surety for the $14,055.40 payment made to the contractor.

■ As for the retainage, it should not be paid to the surety even if it pays the remaining $320 to the subcontractor. The reason is that the Government has a claim against the contractor for the amount improperly paid, $14,055.40, and can, therefore, partially offset its claim by the retainage amount in its possession. See Maryland Casualty Co. v. United States, 141 F.Supp. 900, 135 Ct.Cl. 428 (1956). "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid."[7] United States v. Wurts, 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938). See Wisconsin Cent. R. R. v. United States, 164 U.S. 190, 212, 17 S.Ct. 45, 41 L.Ed. 399 (1896), and United States v. Burchard, 125 U.S. 176, 180–181, 8 S.Ct. 832, 31 L.Ed. 662 (1888).

■ The Government's claim against the contractor was not discharged by the bankruptcy proceedings since it was not a provable claim within the meaning of the Bankruptcy Act, 11 U.S.C. § 35 (1970), amending 30 Stat. 550 (1898), which states as follows in pertinent part:

(a) Debts not affected by discharge.

A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as  *  *  *  (3) have not been duly scheduled in time for proof and allowance, with the name of the creditor if known to the bankrupt, unless such creditor had notice or actual knowledge of the proceedings in bankruptcy;  *  *  *

In Everett v. Judson, 228 U.S. 474, 478–479, 33 S.Ct. 568, 569, 57 L.Ed. 927 (1913), the Supreme Court stated, "The bankrupt's discharge is from all provable debts and claims which existed on the day on which the petition for adjudication was filed." The Ninth Circuit said in Colman Co. v. Withoft, 195 F. 250, 251 (9th Cir. 1912):

The date of filing the petition in bankruptcy is intended to mark the line of separation between debts that are provable and those that are not provable against the bankrupt's estate. Those that are not provable remain subsisting obligations of the bankrupt, and he is not released therefrom by his discharge.  *  *  *

The claim being asserted against the contractor by the Government is contingent upon plaintiff surety's successful assertion of its claim against the Government for the $14,055.40 payment made to the contractor and, therefore, is not a provable debt within the intendment of the Bankruptcy Act. Even though 11 U.S.C. § 103(a) (1970), amending 30 Stat. 562 (1898), states that "Debts of the bankrupt may be proved and allowed against his estate which are founded upon  *  *  *  (8) contingent debts and contingent contractual liabilities;  *  *," the debt at issue here was too contingent an obligation as to liability to have been allowable. At the time the Debtor's Petition in Bankruptcy was filed on June 26, 1972, the existence of the contractor's liability to the Government was less than contingent. It had not yet even come into existence. In Colman Co., supra, at 252, the court held that a claim was not discharged in bankruptcy where " *  *  all the facts necessary to be shown to establish the bankrupt's liability to the claimant had not occurred before the petition in bankruptcy was filed."

In construing § 103(a)(8), the court in Thompson v. England, 226 F.2d 488, 490 (9th Cir. 1955), noting that a claim must be both "provable" under § 103 and "allowable" under § 93, stated:

 *  *  *  Dicta in Justice Stone's opinion [in Maynard v. Elliott, 283 U.S. 273, 51 S.Ct. 390, 75 L.Ed. 1028

---

**7.** This general rule is inapplicable where the Assignment of Claims Act, 41 U.S.C. § 15 (1951), amending 12 Stat. 596 (1862), is in-
volved. Great Am. Ins. Co. v. United States, 492 F.2d 821, 203 Ct.Cl. 592 (1974). That act is not involved in the present case.

(1931)] indicates several situations where provable contingent claims are not capable of reasonable estimation and therefore are not allowable. One of these situations is where the bankrupt's obligation is "beyond the control of the creditor, and dependent upon an event so fortuitous as to make it uncertain whether liability will ever attach." * * *

It is clear that the Government's claim against the contractor was "beyond the control" of the Government as creditor because until plaintiff surety filed its petition herein on June 18, 1973, almost one full year after the Debtor's Petition in Bankruptcy had been filed, not even the contingency of the claim existed. When the bankruptcy petition was filed, the Government could not possibly have known that the contractor would ever be indebted to it for the $14,055.40 payment. There was nothing owed by the bankrupt to the Government. " '[D]ebt' in the bankruptcy law * * * does require that something be 'owed' to the creditor." Zwick v. Freeman, 373 F.2d 110, 116 (2d Cir. 1967), cert. denied, 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96. The Government was not a creditor of the contractor but rather was a debtor. The trustee requested that the Navy pay over the unexpended contract balance under the contract to him as trustee. There was no way that the Government could have established during the bankruptcy proceedings that it had a provable claim for $14,055.40 when plaintiff surety had not yet even instituted suit against the Government. The Government in this case, using procedures under Rule 41, served a summons against the trustee of the bankrupt estate and the Government prayed for judgment against the trustee as well as the contractor. The difficulty with the claim against the trustee is that the Government really does not have a claim against the trustee until final decision in this case. It being so, the Government had no opportunity to file a claim with the trustee and neither has the trustee rejected its claim. There has been no demand and refusal by the trustee to pay.

It appears from the record that the trustee has not responded in any way to the claim of the Government. It is our opinion that under the circumstances the claim against the trustee should be dismissed without prejudice to either party. If the Government wishes to do so and believes it has a valid claim against the trustee, it may bring suit in the United States District Court for the Southern District of California which has primary jurisdiction over the assets of the bankrupt estate. We believe this to be the better procedure. See In re Levinson, 7 F.Supp. 110 (E.D.Pa.1934).

## CONCLUSION

Upon the foregoing opinion, the court concludes as a matter of law that plaintiff surety's motion for summary judgment is allowed in the amount of $14,055.40 but that the recovery by plaintiff surety is conditioned upon the filing with the Clerk of this court, within 30 days after the date on which judgment is entered, of a receipt from Marine Boiler of the sum of $320.

The Government's contingent cross claim against the third-party contractor is allowed in the amount of $14,055.40. The Government's contingent cross claim against the trustee in bankruptcy is dismissed without prejudice.

Plaintiff surety's cross motion for summary judgment as to the $1,990.72 in unexpended contract funds still held by the Government is dismissed.