INTERNATIONAL FIDELITY
INSURANCE COMPANY,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 90–521 C.

United States Claims Court.

March 9, 1992.

Daniel J. Mitterhoff, Washington, D.C., for plaintiff.

Sandra C. McFeeley, U.S. Postal Service, Washington, D.C., for defendant.

OPINION and ORDER

TURNER, Judge.

Plaintiff ("IFIC") is a Miller Act surety that issued bid, payment and performance bonds to the United States Postal Service ("USPS") on behalf of a prime contractor, Rodco Construction, Inc., in connection with several construction projects in Texas and Oklahoma. In an amended complaint, IFIC raises four claims, detailed below, arising out of the Postal Service's response to Rodco's deficient performance on these projects. The matter stands on cross-motions for summary judgment.[1] Oral argu-

---

1. Plaintiff filed a motion for summary judgment on counts I and II on January 22, 1991. Defen- dant filed a cross-motion for summary judg- ment on counts I and II and a motion for

ment was conducted on February 18, 1992. We conclude that summary judgment should be granted in favor of IFIC on counts I and II of the amended complaint and that count IV should be dismissed as moot. Further, we conclude that there are genuine issues of material fact pertaining to count III which preclude a grant of summary judgment for either party.

## I

During 1987, USPS awarded five construction contracts to Rodco. IFIC issued payment and performance bonds for four of the contracts. IFIC issued a bid bond for the fifth contract. Descriptions of the projects, types of bonds submitted and dates of their submission are as follows:

| Project | Bond | Date |
|---|---|---|
| New construction of Bent Tree Station Post Office in Dallas, Texas ("Bent Tree"). | bid | 5/13/87 |
| Fabricate and install sack slide conveyor system at General Post Office in Houston, Texas ("Sack Slide"). | payment performance | 6/4/87 |
| New construction of main post office in Muldrow, Oklahoma ("Muldrow"). | payment performance | 6/10/87 |
| Modifications to North Dock of General Mail Facility in Dallas, Texas ("North Dock"). | payment performance | 7/13/87 |
| Construction of Lake Worth Village Post Office in Fort Worth, Texas ("Lake Worth"). | payment performance | 9/4/87 |

---

### Bent Tree and Sack Slide[2]

On April 23, 1987, USPS issued an invitation for bids to construct the Bent Tree Station postal facility in Dallas. Rodco submitted a bid, and IFIC issued a bid bond for 20% of the bid price. After the bid was accepted by USPS, Rodco was unable to obtain payment and performance bonds in a timely manner. As a result, the contracting officer terminated the contract for default and assessed reprocurement costs of $7452. Rodco then appealed the decision to terminate the contract for default and the assessment of reprocurement costs to USPS Board of Contract Appeals (BCA). IFIC did not make a payment on its bid bond in connection with this project.

On June 4, 1987, USPS and Rodco entered a contract which required Rodco to install a sack slide and feeding conveyor at the Main Post Office in Houston. IFIC issued payment and performance bonds for this project. When Rodco failed to pay its subcontractor for a portion of the work, the subcontractor quit, leaving the project incomplete. The contracting officer terminated the contract for default on December 21, 1987 for failure to complete the project on time and assessed reprocurement costs. Rodco appealed both decisions to the BCA. IFIC did not make a payment under its payment or performance bond in connection with this project.

summary judgment on counts III and IV on April 8, 1991. Plaintiff filed a cross-motion for summary judgment on count III on June 27, 1991.

2. It is not relevant to the outcome of this case that IFIC was the surety on the Bent Tree and Sack Slide projects. The details of these projects are only relevant in that USPS has interposed them as support for its setoff claims which are at issue in counts I and II.

The Bent Tree and Sack Slide appeals were settled on April 5, 1989 by two separate, jointly executed contract modifications.[3] The agreements, which were identical with the exception of the references to specific appeals, were each set forth on USPS contract modification forms with attachments. *Each modification form noted that the agreement was the full and complete agreement of the parties.* The substantive terms of the agreements provided, *inter alia,* for dismissal of the appeals regarding these projects, for conversions of the default terminations to terminations for convenience and for releases by both parties of all claims arising out of the Bent Tree and Sack Slide contracts.

### Muldrow and North Dock

Rodco and USPS entered a contract on June 10, 1987 to construct the main post office in Muldrow, Oklahoma. IFIC issued a payment bond in the amount of $274,999 and a performance bond in the amount of $549,998. The Muldrow project was accepted as complete by USPS on June 17, 1988.

In July 1988, IFIC notified USPS of claims it had received under the payment bond for the Muldrow project and demanded that USPS not release further proceeds to Rodco. Thus, in September 1988, USPS advised Rodco that its demand for final payment was denied based upon IFIC's notice. On October 7, 1988, after having paid $58,946.90 on its payment bond, IFIC demanded the contract balance of $34,767.50. Eventually, IFIC made payments in excess of $100,000 to Muldrow payment bond claimants.

On April 17, 1989, shortly after the settlement agreements on Bent Tree and Sack Slide were executed, USPS advised IFIC that it would deduct reprocurement costs

for the Bent Tree and Sack Slide contracts from the Muldrow balance. IFIC did not learn of the Bent Tree and Sack Slide settlement agreements between USPS and Rodco until obtained from Rodco in August in separate litigation. At no time during the course of negotiating the contract modifications did USPS notify IFIC of the proposed settlements. In fact, on March 24, 1989, IFIC's counsel requested information from USPS regarding any settlements. On April 17, 1989, USPS responded with a letter which stated that "the settlement of Rodco cases are incomplete."

On July 13, 1987, Rodco and USPS entered a contract for modifications to the North Dock at USPS General Mail Facility in Dallas. IFIC issued a payment bond in the amount of $31,373.50 and a performance bond in the amount of $62,747. The project was accepted as complete by USPS on February 11, 1988.

In July 1988, IFIC notified USPS of claims it had received from subcontractors under the payment bond for North Dock and instructed it to withhold payment of any remaining contract balances on this project. IFIC paid claims pursuant to its payment bond in excess of $8,300.

In conjunction with the North Dock project, Rodco made two claims for modifications, both appealed by Rodco to the BCA after denial. In September 1988, USPS paid Rodco $8,300 in settlement of these appeals even though it had knowledge of IFIC's demand to stop all payments to Rodco. USPS now asserts that its release of the $8300 in settlement of the North Dock appeals was a mistake and that when it entered the modification agreements on Sack Slide and Bent Tree, it was under the impression that it had retained the $8300.

---

**3.** The parties disagree about the significance of these documents. USPS claims that it is entitled to the Muldrow and North Dock contract balances pursuant to a single, comprehensive agreement of which the separate contract modifications were only a part. IFIC contends that the modifications are two separate, free-standing agreements between the contracting parties, neither providing that USPS was entitled to retain the Muldrow and North Dock balances.

In support of its argument, USPS submitted an affidavit of its contracting officer, David Bright, and two letters between USPS and Rodco attorneys. IFIC objected, claiming that statements in the letters were hearsay and that the contracting officer's affidavit was not based on personal knowledge. For the reasons stated in Part III, *infra,* we need not decide whether to credit the Postal Service's submissions.

## Lake Worth

On September 4, 1987, USPS and Rodco entered a contract for the construction of the Lake Worth Branch Post Office in Fort Worth, Texas. IFIC issued payment and performance bonds on behalf of Rodco. USPS issued a notice to proceed on October 20, 1987, and the original completion date was scheduled for April 17, 1988. Thus, the contract was to be completed within 180 days. The contract provided for liquidated damages of $250 for each day the project remained unfinished after the project completion date. USPS granted contract extensions for 38 days so that the extended completion date was May 25, 1988.

On May 17, the contracting officer wrote to Rodco noting that construction had fallen behind schedule and requesting a report detailing the problems and a proposed plan for recovery. Rodco responded with a letter which contained a list of reasons for its delay. The extended completion date passed without the project being completed. At this time, USPS neither terminated Rodco nor reserved its right to do so in the future.

The Postal Service's architect-engineer made a monthly report to the contracting officer which reported on the progress at the site. On June 13, 1988, the project was reported to be 87% complete. On July 12, 85% +/− complete; on July 20, 94% complete; and from July 26 on, 95% complete. The performance level dropped sharply during July because subcontractors were not being paid and, as a result, refused to work. Nonetheless, in August, several Rodco employees were still present at the job site. USPS finally terminated Rodco on September 9, 1988.

On September 30, 1988, USPS and IFIC entered a takeover agreement for the completion of the Lake Worth project. IFIC completed the project, and it was accepted by USPS on December 6, 1988. The contracting officer withheld liquidated damages of $43,000, covering the period from May 25, 1988 to December 6, 1988 at $250 per day and paid the remaining contract balance to IFIC.

## Four Counts of Amended Complaint

On June 12, 1990, plaintiff filed this action. The amended complaint includes four counts, as follows: (1) defendant improperly withheld the Muldrow contract balance from plaintiff; (2) defendant improperly paid Rodco the final balance on the North Dock project after being notified by plaintiff that subcontractors and suppliers had made claims on the payment bond; (3) defendant improperly assessed liquidated damages on the Lake Worth contract; and (4) defendant breached an implied covenant of good faith and fair dealing. The parties filed cross-motions for summary judgment pursuant to RUSCC 56.

## II

In the first count, IFIC claims that through its equitable right of subrogation it is entitled to the unpaid balance on the Muldrow contract retained by USPS. In response, USPS contends that IFIC does not have an equitable right of subrogation, and, alternatively, that even if IFIC had an equitable right of subrogation, USPS had a superior right to the fund.

### A

*Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 141–42, 83 S.Ct. 232, 237, 9 L.Ed.2d 190 (1962), establishes that a surety has an equitable right of subrogation to contractor funds retained by the government when the surety pays debts of the contractor to subcontractors pursuant to a payment bond. IFIC paid bond claims totalling more than $100,000 and claims that it is entitled to the entire balance of $34,767.50. USPS, however, relying on *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973), argues that a payment-bond surety lacks standing to assert a right of equitable subrogation until it shows that it has fully paid the claims of the subcontractors arising out of the contract.

In *United States Fidelity & Guaranty Co.*, a payment-bond surety and twenty-three subcontractors with unpaid claims

sued the United States for a progress payment which they alleged the government had improperly paid after receiving notification of the subcontractors' claims. The Court of Claims dismissed the subcontractors for lack of standing, but did not dismiss the surety. The court stated that "[t]he surety is ... subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the defendant." *Id.* at 10, 475 F.2d at 1382. Hence, the case cited by USPS in fact supports the proposition that a surety *does* have standing in this situation. *See also Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160–61 (Fed.Cir.1985) (holding that a surety has standing to sue for a progress payment released by the government after notification by the surety of unpaid subcontractors); *United Elec. Corp. v. United States*, 227 Ct.Cl. 236, 242, 647 F.2d 1082, 1086 (holding that a surety's "standing to sue ... comes from the fact that it is also subrogated to ... the contractor"), *cert. denied*, 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981).

Nonetheless, the court in *United States Fidelity & Guaranty Co.* denied the surety's claim for the progress payment because it had not satisfied all of the outstanding claims of the subcontractors. However, the court provided that the surety could obtain a rehearing if it could prove that it paid all of the subcontractors' claims. In other cases, the Court of Claims has conditioned judgment for the surety on the filing of proof that all subcontractors

were paid. *See, e.g., American Fidelity Fire Ins. Co. v. United States*, 206 Ct.Cl. 570, 513 F.2d 1375 (1975); *North Denver Bank v. United States*, 193 Ct.Cl. 225, 432 F.2d 466 (1970).

At oral argument, USPS agreed that an affidavit from a person responsible for paying Miller Act claims at IFIC, which stated that all claims were paid, would be sufficient. In response, IFIC submitted an affidavit from an attorney responsible for paying these claims stating that, to her knowledge, all payment bond claims from the North Dock and Muldrow contracts had been paid, settled, or were barred by the statute of limitations. We conclude that IFIC has satisfactorily proved that it paid all payment bond claimants. As a result, there is no bar, either as a matter of standing or as part of the case on the merits, to IFIC's pursuit of the Muldrow balance.

## B

Given that IFIC has standing to bring this claim, the issue is whether USPS has a superior right to the retained Muldrow contract balance.

▮ Following the default terminations in Sack Slide and Bent Tree, USPS assessed reprocurement costs against Rodco.[4] Rodco appealed both of these decisions. On April 5, 1988, Rodco and USPS entered modification agreements on Sack Slide and Bent Tree which settled these appeals and released both of the contracting parties from any further claims on those two projects.[5] Nonetheless, USPS informed

---

**4.** The government has a right to set off claims it has against a contractor arising from an unrelated contract against a contract balance that it holds notwithstanding claims of a surety on a payment bond. *United States v. Munsey Trust Co.*, 332 U.S. 234, 239–40, 67 S.Ct. 1599, 1601–02, 91 L.Ed. 2022 (1947).

**5.** The modification (settlement) agreements are identical except for the references to specific appeals. The agreement modifying the Sack Slide contract is as follows:

It is hereby agreed between the contractor and the Postal Service that the termination for default decision dated December 21, 1987, is changed to a "no cost" termination for convenience. *Neither party shall recover any*

*moneys from the other on any pending claim or on any possible future claim.* The Postal Service shall be entitled to keep any and all outstanding contract balances.

It is further stipulated and agreed by the parties that the termination for default shall not be deemed an adverse action against the contractor and that Rodco shall continue to be eligible to bid and be considered for contract awards with the Postal Service.

Contractor hereby agrees that the consideration provided by this modification and settlement agreement constitutes full and complete satisfaction for all direct costs, impact and delay costs, interest, and additional contract completion time which either has or will be incurred in performing the above contract. *Contractor and the Postal Service hereby re-*

IFIC that it intended to set off reprocurement costs on Bent Tree and Sack Slide against the Muldrow final contract balance. USPS now contends that its entitlement to the Muldrow fund does not arise out of its right to assess reprocurement costs but out of a contract it entered with Rodco.

USPS claims that it entered a single, comprehensive settlement agreement with Rodco which was not reduced to a formally executed writing and that the modification agreements were an execution of part of this larger agreement.[6] USPS submitted two letters between the attorneys of Rodco and USPS written in February and March of 1989 prior to the execution of the modification agreements which, it contends, outline the complete agreement.[7] USPS also has submitted the affidavit of David Bright, the contracting officer, asserting that the agreement provided that USPS would retain all funds from all postal contracts not already disbursed. Hence, we are presented with an issue of contract interpretation.

■ USPS argues that we should consider the letters in determining the terms of the contract. In fact, their claim is that the letters constituted the contract. But this ignores the general principle that parol evidence may not be used to vary the terms of an integrated agreement. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126–27, 458 F.2d 994, 1005–1006 (1972); *Peterson–Sharpe Eng'g Corp. v. United States*, 6 Cl.Ct. 288, 295 (1984). Thus, before we may consider these letters, we must determine whether the modifications merged all prior negotiations. The question of whether an agreement is integrated is a question of law. *See Sylvania Elec. Prods.*, 198 Ct.Cl. at 128 n. 9, 458 F.2d at 1006 n. 9; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 209(2) (1981).

■ We hold that the modifications are integrated. The primary reason for reaching this conclusion is that each of the modification documents contained a clause stating that "[t]his supplemental agreement constitutes the full and complete agreement of the parties." The fact that the writings contained merger clauses, while perhaps not conclusive, is certainly a strong indication that the contracting parties intended for the agreements to be completely integrated.[8] This is clearly not a

---

*lease each from the other with respect to any and all claims arising under this contract*

. . . .

Both parties agree to jointly request that the Postal Service Board of Contract Appeals dismiss PSBCA 2251 & 2376 with prejudice. (Emphasis added.)

6. USPS also argues that IFIC lacks standing to challenge the settlement agreements between USPS and Rodco. The claim is certainly meritless, because it is USPS that has made those agreements relevant by interposing them as a defense to IFIC's claim to the Muldrow balance. IFIC surely has standing to rebut this defense.

7. A letter written by Rodco's attorney to USPS, dated February 16, 1989, lists the five contracts between USPS and Rodco and then says that "[t]he Postal Service shall be entitled to keep any and all outstanding contract balances on any of the above contracts." D's App. at 92–93.
   The Postal Service's response, dated March 22, 1989, indicated that the Lake Worth contract should not be covered by the agreement and then stated that there should be further discussions on March 24, 1989 if this were unacceptable. D's App. at 95.
   By letter dated April 4, 1989, Rodco's attorney notified USPS that "[t]he [draft] mods are acceptable except that one element of the agreement that is important to Rodco has been left out." D's App. at 96. That element was that Rodco would continue to be eligible for contracts with USPS.
   The modifications were executed on April 5, 1989 after they were amended to reflect this change. *See supra* note 5.

8. *See ARB, Inc. v. E–Sys., Inc.*, 663 F.2d 189, 198–99 (D.C.Cir.1980) (holding that integration clauses are to be given effect under U.C.C. law and Maryland common law); *Schultz v. Dain Corp.*, 568 F.2d 612, 614 n. 4 (8th Cir.1978) (refusing to give effect to a verbal representation because of a merger clause in the written document); *David Nassif Assocs. v. United States*, 214 Ct.Cl. 407, 420, 557 F.2d 249, 256 (1977) (noting that surrounding circumstances are to be given greater effect where the writing does not testify as to its own finality and completeness); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 216 cmt. e (stating that a merger clause "is likely to conclude the issue whether the agreement is completely integrated"); 3 Arthur L. Corbin, *Corbin on Contracts* § 578 (1960) (stating that a merger clause is "conclusive as long as it has itself not been set aside by a court on grounds of fraud or mistake,

situation where the party being held to a merger clause was unaware of its inclusion or effect.

The parol evidence itself indicates that the contracting parties never reached an agreement until the modifications were executed because as late as April 4, 1989, changes were being made to drafts of the modification agreements. *See supra* note 7.

Other indications that the writings were integrated are the fact that the terms of the contract were detailed and the fact that they were signed by both of the contracting parties and written on standard government forms.[9] There would have been no need to include such a detailed account of the contract in the modification documents if they were merely an execution of part of some larger agreement.

■ Even though the modifications were integrated and thus could not be varied by parol evidence, parol evidence is still admissible to explain an ambiguity. *See Greco v. Department of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir. 1988). "[T]he preliminary question of whether an ambiguity exists is a question of law that may be resolved summarily by the court." 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2730.1 (1983). A contract is ambiguous if its language is reasonably susceptible to more than one meaning. *See Neal & Co. v. United States*, 19 Cl.Ct. 463, 471 (1990), *aff'd*, 945 F.2d 385 (Fed.Cir.1991); *Ralph Larsen & Son, Inc. v. United States*, 17 Cl.Ct. 39, 43 (1989); *John C. Grimberg Co. v. United States*, 7 Cl.Ct. 452, 457, *aff'd*, 785 F.2d 325 (Fed.Cir.1985). However, the fact that both parties are asserting different interpretations does not render a contract ambiguous. *See Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 315, 427 F.2d 722, 725 (1970) (*quoting Bishop Eng'g*

*Co. v. United States*, 180 Ct.Cl. 411, 416 (1967)); *Neal & Co.*, 19 Cl.Ct. at 471.

■ At oral argument, USPS claimed that the portion of the modifications providing that "[t]he Postal Service shall be entitled to keep any and all outstanding contract balances" meant that USPS was entitled to the Muldrow and North Dock balances. If this were a reasonable interpretation of the language, there would be an ambiguity and parol evidence would be admissible.

In our view, this interpretation is implausible. First, this interpretation is contrary to what a reasonable person would expect this language to mean. In the letter dated February 16, 1989, Rodco's attorney specifically listed the five contracts and then recited that "[t]he Postal Service shall be entitled to keep any and all outstanding contract balances *on any of the above contracts* (emphasis added)." Hence, the contracting parties knew how to express their intentions yet eliminated this last phrase in the modification documents.

Moreover, it is simply undeniable that the statement must either refer to the balance on the contract being modified or to any contract balance USPS had on any project with Rodco. But USPS claims that the language means something in between. It contends that the Lake Worth project is totally separate from these settlements even though the Lake Worth project is not expressly carved out of the modification agreements. If the parties had intended the phrase to apply to some—but not all—balances under contracts distinct from the contracts that were being modified, they would not have chosen the language that appears in the agreements.

Having determined that the modifications were integrated and unambiguous, there is little else to resolve. The contracts do not mention the Muldrow and North

---

or on some ground that is sufficient for setting aside other contracts").

**9.** *See* RESTATEMENT (SECOND) OF CONTRACTS § 210 cmt. b (1981) ("A document in the form of a written contract, signed by both parties and apparently complete on its face,

may be decisive of the issue [of complete integration] in the absence of credible contrary evidence."); John Cibnic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 136 (2d ed. 1985) (noting that most contract documents used in federal procurement are integrated).

Dock balances, and we will not read this additional term into them. Pursuant to the plain language of the modifications, we conclude that USPS does not have a right to the Muldrow contract balance and that, by paying claims of subcontractors, IFIC became entitled to the balance.

### III

In the second count, IFIC, relying on *Great American Insurance Co. v. United States*, 203 Ct.Cl. 592, 598–600, 492 F.2d 821, 825 (1974), claims that it is entitled to the $8,300 that defendant released to Rodco after receiving notice from IFIC of unsatisfied claims of subcontractors on the North Dock project. In *Great American*, the court found the government liable for releasing a final contract payment to a government contractor after notification of unpaid claims of laborers. *See id.* The court ruled that the government had improperly abandoned its role as stakeholder in electing to decide the merits of the conflicting claims without a valid reason for doing so. *See id.*

■ The Federal Circuit has reaffirmed the government's duty as a stakeholder in the context of a case dealing with a progress payment. *See Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1162 (Fed. Cir.1985). In *Balboa*, the Federal Circuit explained that the standard for assessing government payments made to contractors in the face of notice from the surety of payment defaults is significantly different depending on whether the government received notice from the surety before or after the completion date. *See Balboa*, 775 F.2d at 1164; *see also Great Am.*, 203 Ct.Cl. at 599, 492 F.2d at 825; *Argonaut*

*Ins. Co. v. United States*, 193 Ct.Cl. 483, 493, 434 F.2d 1362, 1367–68 (1970). During performance, the government has an interest in paying the contractor to insure timely completion of the project. *See Balboa*, 775 F.2d at 1164. Accordingly, the government is merely obligated to exercise discretion in weighing the surety's interest against its own. *See id.* After completion, the government has no valid reason to decide the merits itself.[10] Hence, in this case, summary judgment in favor of plaintiff is appropriate because the North Dock project was accepted as complete before notice of unsatisfied subcontractor claims was received.

USPS contends that IFIC lacks standing to bring this claim because it did not show that it fully satisfied all of the claims of subcontractors, and, alternatively, that IFIC was not injured by the payment to Rodco because USPS actually had the superior right to the money.[11]

■ Because we have already determined that IFIC has standing to assert its equitable right of subrogation, *see supra*, Part II A, we turn to the question of which party had a superior right to the amount paid to Rodco. USPS claims it has a superior right to the $8,300 for two reasons. First, USPS argues that because it had not yet waived its right of setoff from Sack Slide and Bent Tree on the date it sent the $8,300 to Rodco, it did not have any responsibility as a stakeholder vis-a-vis the competing claims of Rodco and IFIC.

By deciding to release the North Dock balance, USPS effectively declined to exercise its right of setoff. USPS has not cited any authority for the proposition that an existing right of setoff arising from some

---

10. There is no longer any dispute as to the merits of the claim as between Rodco and IFIC because IFIC has obtained a judgment against Rodco.

11. The USPS also argues that a letter it sent on October 25, 1988 to IFIC sufficed to fulfill its duty as a stakeholder. The letter, written by postal attorney Blanchard, notified IFIC that Rodco had requested the $8,300 and asked for IFIC's position on the fund. However, IFIC responded on February 3, 1989 reasserting its right to the balance because it had paid Rodco's

subcontractors. Furthermore, when the USPS is acting solely as a stakeholder, i.e. when it has no interest in timely completion of the project, its duty is to pay the proper person and be liable for any incorrect distribution. *See United States Fidelity & Guar. Co. v. United States*, 201 Ct.Cl. 1, 8, 475 F.2d 1377, 1380–81 (1973); *Newark Ins. Co. v. United States*, 144 Ct.Cl. 655, 658–59, 169 F.Supp. 955, 957 (1959). Interpleader actions were designed to make this duty bearable. *See generally* 7 Wright et al., *supra*, § 1702 (1986).

unrelated contract gives the government a right to disregard the relative priorities of a surety and a contractor to a contract balance.[12] We decline the rule proposed by USPS, especially when USPS has not established the validity or amount of the reprocurement costs. In sum, although USPS may have had the right of setoff it asserts respecting the North Dock balance, it did not exercise such right and instead distributed the funds to one lacking entitlement.

Second, USPS also argues that IFIC is not entitled to the $8,300 because it was not injured. Specifically, USPS claims that awarding IFIC the balance would be a windfall because had USPS not mistakenly sent Rodco the $8,300, it would be entitled to retain it pursuant to the single, comprehensive agreement settling Bent Tree and Sack Slide and allowing USPS to keep the Muldrow and North Dock balances. We have already decided that USPS is not entitled to the Muldrow and North Dock balances pursuant to the 1989 settlement agreements. *See supra*, Part II B.

### IV

In its third claim, IFIC contends that USPS wrongfully withheld $43,000 in liquidated damages from IFIC under the Lake Worth contract. In support of its contention, plaintiff argues that defendant improperly terminated Rodco for default, and, as a result, that USPS was precluded from assessing any of the liquidated damages. Alternatively, IFIC argues that defendant failed to mitigate damages by unnecessarily delaying its termination of Rodco. Under this alternative argument, IFIC is seeking the portion of the $43,000 which accrued due to the Postal Service's unnecessary delay.

### A

◼ "[A] default-termination is a drastic sanction ... which should be imposed

(or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 187 Ct.Cl. 45, 57, 408 F.2d 424, 431 (1969). The government has the burden of proving that a termination for default was justified. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987). USPS asserted three justifications for the termination for default: (1) that Rodco failed to complete the project by the required completion date, (2) that Rodco falsely certified that it had paid subcontractors in its progress payment requests and (3) that Rodco abandoned the project.

Although Rodco failed to complete the project by the required completion date, IFIC contends that USPS waived its right to terminate for default because it waited 107 days beyond the required completion date to terminate Rodco.

> The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.

*DeVito v. United States*, 188 Ct.Cl. 979, 990–91, 413 F.2d 1147, 1154 (1969).

Rodco continued to make progress through June and into July, 1988 and USPS was aware of the continued performance because it had an architect-engineer making weekly progress reports. Accordingly, the second prong of the *DeVito* doctrine is established as a matter of law.

◼ The determination of what constitutes a reasonable period of forbearance, however, depends on the facts of each case. *See H.N. Bailey & Assocs. v. United*

---

12. The USPS cites *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973). In that case, the Court of Claims held that "[a] surety that pays on its payment bond, however, does not have priority *when* the United States is asserting a tax or other obligation owed by the prime contractor." *United*

*States Fidelity & Guaranty Co.*, 201 Ct.Cl. at 12, 475 F.2d at 1383 (emphasis added). This case does not suggest the proposition asserted by the USPS because it contemplates that the government must affirmatively assert a debt owed to it by a contractor.

*States,* 196 Ct.Cl. 156, 164, 449 F.2d 387, 391 (1971); *DeVito,* 188 Ct.Cl. at 991, 413 F.2d at 1154. The test is whether circumstances would indicate to a reasonable contractor that late performance would be acceptable. *See Martin J. Simko Constr., Inc. v. United States,* 11 Cl.Ct. 257, 269 (1986), *vacated on other grounds,* 852 F.2d 540 (Fed.Cir.1988). Although we acknowledge that the waiver doctrine is rarely applied in favor of the contractor in construction contract disputes, *see Indemnity Ins. Co. of North America v. United States,* 14 Cl.Ct. 219, 224 (1988), this case may fit within the parameters of the waiver doctrine. *See Sun Cal, Inc. v. United States,* 21 Cl.Ct. 31, 40 (1990) (finding that the government waived its right to terminate for default in a construction contract case).

In this case, USPS waited 107 days to terminate a contract in which the performance period was to be 180 days. We conclude that the reasonableness of the Postal Service's forbearance is a genuine issue of material fact. Although the determination of what is reasonable may be resolved as a matter of law in some cases, in this case the determination is particularly fact-intensive. A more complete record will help the court resolve the question. *See generally* 10A Wright et al., *supra,* § 2725.

The Postal Service's second justification for the termination for default is that Rodco falsely certified that it had paid all of its subcontractors on two requests for progress payments. The case relied upon by USPS, *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 563–66, 81 S.Ct. 294, 316–17, 5 L.Ed.2d 268 (1961), held that the government could disaffirm a contract which violated the then-existing federal conflict-of-interest statute. In *Joseph Morton Co. v. United States,* 757 F.2d 1273, 1279 (Fed.Cir.1985), the Federal Circuit held that fraud committed by a contractor which resulted in conviction for conspiracy and knowingly submitting false cost claims was sufficient to support a termination for default. Although not cited,

we assume that USPS is claiming that Rodco violated the False Claims Act, 31 U.S.C. § 3729 (1988). In any event, USPS attempts to prove its assertion that Rodco falsified progress-payment requests by pointing to the notice from IFIC that it had received claims on its payment bond. We conclude that it would be inappropriate to decide this issue by inference, especially when the mandate of *J.D. Hedin* is that the government justify a default termination with solid evidence. *See J.D. Hedin,* 187 Ct.Cl. at 57, 408 F.2d at 431.

Third, USPS argues that Rodco abandoned the project by failing to perform any substantial work after June 1988. *See Universal Fiberglass Corp. v. United States,* 210 Ct.Cl. 206, 215, 537 F.2d 393, 397 (1976) (holding that the government can terminate a contractor for failure to make progress). USPS contends that the fact that the estimate of completion remained at the 95% mark after the beginning of July and that few employees were at the construction site is an abandonment by Rodco justifying the termination for default. The fact that there were employees at the construction site precludes us from concluding, as a matter of law, that Rodco abandoned the contract. Since only the last 5% of the project remained by July, it may have been that only a few employees were needed on site. Thus, we conclude that this is a factual issue which must be decided on a complete record.

Accordingly, USPS has not shown, as a matter of law, that its termination of Rodco for default was justified. Each reason it has given is fact-intensive and not appropriately decided by summary judgment.

### B

Plaintiff's second argument is that USPS failed to mitigate damages by unreasonably delaying termination of Rodco and execution of the takeover agreement. The doctrine of mitigation of damages is well-established in both the common law [13] and the Postal Service's own guide-

---

**13.** *See Martin J. Simko Constr., Inc. v. United States,* 11 Cl.Ct. 257, 272 (1986), *vacated on other grounds,* 852 F.2d 540 (Fed.Cir.1988);

lines.[14] The doctrine requires the non-defaulting party to act within a reasonable time after default to mitigate damages. *See Ketchikan Pulp Co. v. United States,* 20 Cl.Ct. 164, 166 (1990) ("[a]ll that is required is that the government act reasonably and promptly given the circumstances"). Further, the defaulting contractor bears the burden of establishing a prima facie case for failure to mitigate. *See id.*

IFIC claims that the delay in terminating Rodco and in executing the takeover agreement was unreasonable. Whether the government has acted within a reasonable time after default is a question of fact. *See Astro–Space Lab., Inc. v. United States,* 200 Ct.Cl. 282, 308, 470 F.2d 1003, 1018 (1972); *Udis v. United States,* 7 Cl.Ct. 379, 387 (1985). Therefore, we conclude that the reasonableness of the Postal Service's conduct presents a genuine issue of material fact precluding a grant of summary judgment for either party.

## V

In count IV of the amended complaint, IFIC asserts that USPS owed it a duty of good faith and fair dealing, which was breached by the Postal Service's failure to disclose information pertaining to the settlement agreements on the Sack Slide and Bent Tree projects. On March 24, 1989, IFIC's counsel wrote a letter to USPS requesting information regarding all settlements. USPS responded on April 17, 1989 stating that "the settlement of Rodco cases are incomplete." IFIC alleges that this shows bad faith. IFIC also charges USPS with not negotiating in good faith because one official was negotiating for the release of Muldrow funds while another was preparing to set off the reprocurement costs against the balance.

The Court of Claims held in *Commerce International Co. v. United States,* 167 Ct.Cl. 529, 536, 338 F.2d 81, 85 (1964), that

the duty of the government to carry out its bargain reasonably and in good faith was implicit in all government contracts. *See also Malone v. United States,* 849 F.2d 1441, 1445–46 (Fed.Cir.1988) (holding that the government's breach of its duty of good faith and fair dealing justified relieving the contractor of a default termination); RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ("[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement").

Nonetheless, at oral argument, IFIC conceded that this claim would be redundant if it were to succeed on counts I and II. Because IFIC is entitled to summary judgment on counts I and II, count IV will be dismissed as moot.

## VI

### A

Based on the foregoing, plaintiff's motion for summary judgment with respect to counts I and II of the amended complaint is GRANTED. It follows that defendant's cross-motion with respect to counts I and II is DENIED. Genuine issues of material fact preclude summary judgment for either party on count III; consequently, each party's motion for summary judgment with respect to count III is DENIED WITHOUT PREJUDICE. Count IV of the amended complaint shall be dismissed as moot.

Entry of judgment in favor of plaintiff on counts I and II of the amended complaint and dismissing count IV of the amended complaint shall be withheld pending resolution of count III of the amended complaint.

### B

The parties shall file a joint status report not later than Monday, March 30, 1992 advising of (1) the most convenient location for trial with respect to count III of the

---

*Churchill Chem. Corp. v. United States,* 221 Ct. Cl. 284, 288, 602 F.2d 358, 364–65 (1979).

**14.** The Post Office Procurement Manual provides: "When a contract provides for liquidated damages, the contracting officer must mitigate damages when grounds for termination for default exist by obtaining performance by the contractor or terminating the contract for default." § 6.9.3(a)(3) (1988).

amended complaint, (2) the time which will be required for such trial and (3) any other matters which the parties deem appropriate.

It is contemplated that precise dates for pre-trial conference and trial and for submission of memoranda of contentions and other items described in paragraphs 11 through 15 of Appendix G, RUSCC, shall be selected during an unrecorded telephone conference with counsel to be initiated by the court upon receipt of the joint status report designated in the preceding paragraph.