TRANSAMERICA PREMIER
INSURANCE COMPANY,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–840C.

United States Court of Federal Claims.

Nov. 17, 1994.

Jeffrey J. Bernstein, with whom were Deputy Director Mary Mitchelson, Director David M. Cohen, Asst. Atty. Gen. Frank W. Hunger, Dept. of Justice, Washington, DC, and Lieutenant Colonel Marilyn David, Dept. of the Air Force, Arlington, VA, for defendant.

Adam C. Harrison, Robert M. Wright and Gerard P. Sunderland, Whiteford, Taylor & Preston, Baltimore, MD, for plaintiff.

1. Suretyship law identifies three parties in the surety relation: the obligee, the principal obligor, and the secondary obligor. In the public contracts context, these are respectively the Government, the contractor and the surety. *See* Restatement (Third) of Suretyship Title B, Introductory Note (Tent.Draft No. 1, 1992).

2. Plaintiff's letter of March 12, 1991, reads, in part, as follows:

 [Transamerica Premier Insurance Company] has now been contacted by several subcontractors and suppliers making claims totalling over $90,000.00 under the Payment Bond we provided to this project.

## OPINION

WIESE, Judge.

This case is before the court on defendant's motion to dismiss for lack of jurisdiction and, alternatively, on the parties' cross-motions for summary judgment. The issue is whether plaintiff, a Miller Act surety, is entitled to invoke the doctrine of equitable subrogation to recover from the Government the amount of contract proceeds that were paid over to plaintiff's insured (the contractor) after (i) the Government was made aware of plaintiff's competing interest in those funds, and (ii) the contract had been completed to the Government's satisfaction. Judgment is for the plaintiff.

### FACTS

Plaintiff, Transamerica Premier Insurance Company, was surety to a contract executed on September 30, 1988 between the Department of Air Force (the Department) and Concrete Development Corporation (CDC). The Department hired CDC to repair Arnold Avenue at Bolling Air Force Base in Washington, D.C. Pursuant to the Miller Act, 40 U.S.C. §§ 270a–270d (1988 & Supp. IV 1992), plaintiff posted both a performance and a payment bond in favor of CDC, the principal obligor.[1]

On March 12, 1991, plaintiff wrote the Department advising that it had received notice of claims from subcontractors and suppliers (for convenience, we shall call them "materialmen") in excess of $90,000. In this letter, plaintiff also asserted a right to the remaining contract funds and asked the Department to protect these funds for the sake of the materialmen.[2]

At this time, this company is without information concerning the validity of the claim being made or the ability of Concrete Development Corporation to make payment to claimants on this job. Although no determination has been made in respect to whether Transamerica Premier Insurance Company will suffer a loss as a result of meeting its obligations under the bond, we want to put you on notice that as Surety, we have legal and equitable rights in and to the contract balances and retention which remain in your possession and which are either due or may become due in the future.

Therefore, Transamerica Premier Insurance Company is providing notice of its expectations

At the behest of plaintiff and with CDC's acquiescence, the Department issued a unilateral contract modification, "P00007", on April 10, 1991, changing the mailing address for the remaining contract payments from CDC's office to that of the plaintiff. The Department issued this modification under the authority of F.A.R. § 43.103(b) (1991).[3] Pursuant to P00007, on April 19, 1991, the Department sent plaintiff a check payable to CDC for $79,407.30. This check represented one of two final payments due on the contract to CDC.

CDC completed the contract to the Department's satisfaction sometime in April 1991. On May 6, 1991, plaintiff sent the contracting officer a second letter stating that it had received notice of claims from materialmen in excess of $125,000. Plaintiff again asserted a right to the remaining contract proceeds and further demanded that these proceeds be forwarded to its office.[4] In reply, the contracting officer wrote plaintiff on May 14, 1991, assuring it that the final contract payment, $35,376.56, would, in fact, be transmitted to Transamerica pursuant to P00007.

However, on June 14, 1991, due to an administrative error, this final contract payment was forwarded instead to CDC. On the first of August, 1991, the Department acknowledged in a telephone conference with plaintiff that it had made a mistake in directing the final payment to CDC. Plaintiff thereupon wrote the contracting officer on August 7, 1991, demanding that a new check be issued in its name. The Department ulti-mately refused this request; however, it did attempt, though not with any success, to recover the misdirected payment from CDC.

On December 20, 1991, plaintiff issued a check payable to one of CDC's materialmen, Genstar Stone Products Company, in the amount of $113,788.72. On December 8, 1992, plaintiff filed suit in this court seeking judgment in the amount of the final contract payment, $35,376.56, together with interest and attorneys' fees.

## DISCUSSION

### Defendant's Motion To Dismiss

 Defendant has moved to dismiss this action, arguing that the court lacks jurisdiction. We reject the argument. A surety's traditional means for gaining access to this court is through the equitable doctrine of subrogation. *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed.Cir.1985). Generally, that doctrine allows a party that has satisfied another's debt to step into the shoes of the one whose claim has been paid. "One who rests on subrogation stands in the place of one whose claim he had paid, as if the payment giving rise to the subrogation had not been made." *United States v. Munsey Trust Co.*, 332 U.S. 234, 242, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947). As noted in the Restatement (Third) of Suretyship § 23 cmt. a (Tent.Draft No. 2, April 1993), subrogation is often referred to as "an equitable assignment" or "an assignment by operation of law."

---

that all interest in contract funds due or to become due under the provisions of the pertinent contract agreement be protected fully by the proper application of such funds to the performance of the contract and to the credit of obligations due or to become due to laborers, material suppliers and subcontractors....

3. 48 C.F.R. § 43.103(b) (1991) authorizes the contracting officer to make certain contract modifications unilaterally. "A unilateral modification is a contract modification that is signed only by the contracting officer. Unilateral modifications are used, for example, to—(1) make administrative changes...."

4. This second letter reads, in part, as follows:
Please be advised that Transamerica Premier ... has received claims from various subcon-tractors and suppliers on the [Arnold Avenue] project in excess of $125,000.00. We have been notified of additional claims by suppliers and subcontractors under the contract for which no bond claims have been made at this time. Reserves are posted to satisfy those claims found covered by our bond after the completion of our investigation.
Surety hereby makes demand for any and all contract balances, including any and all estimates earned by the contractor but unpaid, as well as any unexpended balances of the contract funds after completion, including retainage.

. . . . .

Any checks for these funds should be directed to this office.

. . . . .

■ A surety can establish a right of subrogation in either of two ways: by completing the contract pursuant to its obligation under the performance bond or by paying off materialmen's claims brought under the payment bond. In the first situation—where the surety completes the contract—it steps into the shoes of the Government. *Dependable Ins. Co. v. United States*, 846 F.2d 65, 67 (Fed.Cir.1988). When paying off materialmen however, the surety is subrogated not only to the rights of the materialmen to retained contract funds, but also to the right of the Government to use retained contract funds to pay materialmen, and the right of the contractor to these funds in the event he has paid his materialmen. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141, 83 S.Ct. 232, 237, 9 L.Ed.2d 190 (1962). Hence, a surety that has paid materialmen's claims can come directly against the Government as the holder of retained contract funds.[5]

In this case, plaintiff rests its claim to recovery on the fact of its payment to one of CDC's materialmen, Genstar Stone Products Company. Specifically, in its complaint, plaintiff alleged that "[a]fter application of the one check received from the United States, Transamerica has still suffered a loss of $35,376.56 plus its expenses and attorney's fees incurred by reason of its execution of the Bonds." Defendant, in seeking the dismissal of plaintiff's suit for lack of jurisdiction, initially raised the contention that this allegation left in doubt whether Transamerica had, in fact, made payment under its payment bond. Hence, from defendant's standpoint, Transamerica failed to state facts sufficient to validate its right to proceed in this court pursuant to the doctrine of subrogation. Accordingly, the motion to dismiss was filed.

To remedy this alleged "defect" in its pleading, plaintiff filed the affidavit of Thomas Pettygrove, a bond claims specialist employed by Transamerica and the individual having personal knowledge and responsibility with respect to claims originating under the bond posted for the Arnold Avenue project.

Mr. Pettygrove's affidavit recites that "as a result of Transamerica's contractual bond obligations, Transamerica was required to pay Genstar the amount of its claim totalling $113,788.72." Accompanying the affidavit are copies of the bond agreements between plaintiff and CDC, the check that was issued to Genstar by Transamerica and, finally, the "release and assignment of claim" signed by Genstar's president, acknowledging that company's receipt of payment from Transamerica in the amount of $113,788.72 in discharge of a claim "for materials and supplies furnished on and in behalf of Concrete Development Corp." on the Arnold Avenue project.

■ Notwithstanding this documentary support of plaintiff's claim, defendant insists that the matter remains ripe for dismissal on jurisdictional grounds. Specifically, defendant contends that, under Rule 56(f), an affidavit offered in support of a motion for summary judgment must be accompanied by sworn or certified copies of all papers or parts thereof referred to in the affidavit. Since Mr. Pettygrove stated in his affidavit that he "reviewed the books and records of Transamerica," defendant maintains that copies of these materials must accompany the affidavit. And lacking these materials, the argument goes, the affidavit is incomplete and cannot be relied upon to establish Transamerica's payment to Genstar.

The argument lacks substance. For one thing, the affidavit makes clear that the *primary* source of Mr. Pettygrove's information was not the company's books and records but, rather, the affiant's own "personal knowledge of claims and expenses incurred by Transamerica for contractual obligations payable to claimants on various bonds executed by Transamerica," including the matter in issue here. Hence, the supplementary information defendant now insists upon could do no more than repeat—though in a format less helpful than the affidavit itself—the substance of those transactions that originated in the first instance with Mr. Pettygrove in his capacity as bond specialist. To put it another way, the books and records could say

---

**5.** *See* Restatement (Third) of Suretyship § 27 cmt. a (Tent.Draft No. 2, April 1993) "[T]he rights of the performing secondary obligor [the surety] are essentially equivalent to a direct action against the obligee [the Government] ... and may be more easily understood as such."

no more than the affidavit now does for both owe their recitals to the same source.

Moreover, to the extent defendant means to seek independent corroboration of the facts recited in the Pettygrove affidavit, it is hard to understand what better proof Transamerica could have offered than that which it did provide: copies of (i) the bond issued in favor of CDC, (ii) the check issued in favor of CDC's unpaid supplier, Genstar, and (iii) the signed acknowledgment by Genstar of its receipt of claim payment from Transamerica. If these materials cannot suffice to establish the fact of payment, then none ever will. The court holds that this information, together with the background facts set out in the Pettygrove affidavit, are plainly sufficient to establish that Transamerica has paid out under its payment bond. To the same effect *see Continental Casualty Co. v. American Sec. Corp.*, 443 F.2d 649, 650–51 (D.C.Cir.1970), *cert. denied sub nom. Mather Constr. Co. v. Continental Casualty Co.*, 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971). Accordingly, the motion to dismiss for lack of jurisdiction is denied.

*Defendant's Cross–Motion For Summary Judgment*

Defendant contends that even if the jurisdictional issue should be decided against it, nevertheless the merits of the dispute must be decided in its favor. Defendant offers a number of arguments in support of its position. Chief among these is the contention that the Government's duty to safeguard contract funds for the surety's benefit can arise only after the surety has informed the Government of the contractor's default. Only such notice as informs the Government of the contractor's actual default in the payment of materialmen is said to trigger the Government's responsibility to withhold payment of contract proceeds to the contractor. Defendant points to language in Transamerica's letters which indicates that plaintiff was "investigating" the validity of the materialmen's claims and argues that because the letters speak at most of a *possible* default, the Government's equitable duty to guard against a contractor's misuse of contract proceeds was not raised.

The court does not agree with this contention. Under suretyship law, contract funds in the hands of the obligee are viewed as security or "collateral" to which the surety can turn to cover any losses that may be incurred should the principal obligor (the contractor) default on the underlying obligation and the surety be required to pay out under its bond. *Home Indem. Co. v. United States*, 180 Ct.Cl. 173, 177, 376 F.2d 890, 893 (1967) ("[T]he contract retainage is a security held by the Government for the protection of itself and the surety...."). As holder of the contract funds, suretyship law requires the Government to use "reasonable care in the custody and preservation of collateral in its possession." Restatement (Third) of Suretyship § 38 cmt. e (Tent.Draft No. 2, April, 1993). Thus, the Government, although not in privity with the surety, does have an obligation, consistent with its own business needs, to avoid actions that impair the surety's interest in the contract collateral, *i.e.*, the contract proceeds on hand payable for work done. And that obligation is triggered not only when the Government is informed of the contractor's actual default but also—and perhaps more typically—when the Government receives reasonable warning from the surety of a contractor's *threatened* default under the bond.

A case in point is *Newark Ins. Co. v. United States*, 144 Ct.Cl. 655, 169 F.Supp. 955 (1959). There the surety had received reports that various laborers and materialmen were not being paid. This information was passed on to the Government by the surety along with a request that the Government make no further payments to the contractor pending an investigation of the matter. Although the Government initially indicated that it would refrain from making any further payments, it nevertheless went ahead and paid the contractor for completed work. As matters turned out, although the contractor had indeed completed the work for which the payment was given, it had not fully paid the laborers and materialmen for their performance. Plaintiff was thus called upon to make payment under its bond and it thereafter brought suit against the Government to recover the sums paid out.

The Government defended the action by claiming that a surety could have recourse against the Government only where the Government was still in possession of contract funds. Having paid out the funds due under the contract, the Government contended that it was without liability in the matter. The argument was rejected. Said the court:

> Surely a stakeholder, caught in the middle between two competing claimants, cannot, in effect, decide the merits of their claims by the mere physical act of delivering the stake to one of them. If his position as stakeholder becomes uncomfortable, and the claimants do not take steps to get a judicial solution of the question, the law has provided him with an interpleader proceeding by which he can deposit the stake in court and walk out free of the annoyance of being in the middle.
>
> If it is made to appear that the Government's officials, after due notice of the facts giving rise to an equitable right in the plaintiff surety company, and of the plaintiff's assertion of such a right, paid out, without a valid reason for so doing, the money in question to someone other than the plaintiff, the plaintiff will be entitled to a judgment.

144 Ct.Cl. at 658–59, 169 F.Supp. at 957.

■■ The *Newark* decision stands for the proposition that where the Government has on hand contract funds owing for work done and is alerted, by the surety, to the possibility of unpaid materialmen's claims, and to the surety's demand that the contract funds be protected pending investigation, it may not dispense those funds to the contractor—at least not without running the distinct risk of having to pay twice. The rule is one this court has long adhered to. For other cases on point *see Great Am. Ins. Co. v. United States*, 203 Ct.Cl. 592, 596–99, 492 F.2d 821, 825 (1974) (contracting officer's demand for proof of surety's payment to materialmen before agreeing to withhold contract funds deemed improper because the Government became a stakeholder of those funds upon receipt of the surety's timely notice that materialmen were making claims against the bond and of the surety's demand for protection of those funds); *Home Indem. Co. v.*

*United States*, 180 Ct.Cl. 173, 178, 376 F.2d 890, 893 (1967) (Government became stakeholder when it was in receipt of surety's second letter, sent after completion of the contract, advising that two suppliers had made bond claims and asking the Government to retain any remaining funds pending settlement of the unpaid job expenses); *American Fidelity Fire Ins. Co. v. United States*, 206 Ct.Cl. 570, 578–79, 513 F.2d 1375, 1380 (1975) (surety's letter implying imminent default of contractor and asserting the surety's rights to remaining contract funds triggered the Government's stakeholder duty upon receipt before disbursement of final contract funds); and *International Fidelity Ins. Co. v. United States*, 25 Cl.Ct. 469, 477 (1992) (Government held to stakeholder duty where surety sent post-contract letter informing Government of claims received from subcontractors and demanding withholding of remaining contract funds).

Defendant attempts to overcome the force of these cases by arguing that the principle they assert has been supplanted by a more rigorous standard set out in *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495 (Fed. Cir.1990). As defendant reads it, that case adopts the rule that only notice of a contractor's actual default can trigger the Government's duty to safeguard contract proceeds for the benefit of the surety.

Defendant reads too much into the *Fireman's Fund* opinion. The principal issue in the case was whether a surety, acting many months after the fact, could attack the Government's release of contract retainages as an improvident disbursement of contract funds. The surety's contention was that the Government should have recognized, at the time of its release of the contract retainages, the likelihood of the contractor's default because of then-current complaints of late payment and nonpayment from subcontractors and suppliers. The court of appeals rejected this argument. The court held that it was only notice from a surety that counted; not information the Government might glean from other sources.

■■ In explaining this result, the appellate court made the statement defendant now presses upon us: "the government as obligee

owes no equitable duty to a surety like Fireman's Fund unless the surety notifies the government that the principal has defaulted under the bond." 909 F.2d at 498. Defendant's view is that the quoted statement defines the rule of law applicable to all subrogation actions, *i.e.*, that no duty is owed the surety by the Government save where the Government has been informed by the surety of the contractor's actual default.

We do not agree with this reading. We think it clear from the problem raised in the case that the quoted statement was intended to address the specific facts before the court rather than to proclaim a rule of universal application that would displace, without comment or discussion, the principles adhered to in earlier cases. "It cannot be assumed that the Court would overturn so impressive an array of long standing precedents or depart from a position so firmly established without expressing its intention so to do and the reasons therefor in plain and explicit terms." *Penn Mut. Life Ins. Co. v. Slade*, 47 F.Supp. 219, 222 (E.D.Ky.1942).

Moving on to the next argument, defendant contends that even if Transamerica's letters are considered sufficient to have alerted the Government to the need for caution in its disposition of contract proceeds, nevertheless the Government's status as a stakeholder does not require that it do more than act with reasonable discretion in the payment of those proceeds. And that obligation, it asserts, was satisfied here.

In support of the argument, we are referred to *Balboa Ins. Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985), a case in which the court of appeals enumerated eight factors to be considered in testing the reasonableness of the Government's response to a surety's entreaty for protection against the misapplication of contract funds by a contractor. It is pointed out that plaintiff has not addressed these factors in its brief. Rather, defendant notes, Transamerica seeks to establish liability simply by relying on the De-

partment's mistake in issuing a check directly to CDC. That mistake alone, defendant contends, is not enough to render the Government liable as a stakeholder under the standards enumerated in *Balboa*.[6]

The argument is far off the mark. In *Balboa* the surety had demanded the withholding of contractor progress payments. Nevertheless, the Government disbursed one of the progress payments to the contractor. The Federal Circuit laid out eight factors by which to test the reasonableness of the Government's conduct when the Government still retained an interest in the contract funds, *i.e.*, before the completion of the contract. Defendant argues that these factors apply to the instant matter—a matter which is indisputably about the Government's conduct *after* completion of the contract—and it asks that we find the Department acted reasonably.

■ Defendant's argument fails primarily because it ignores *Balboa*'s crucial emphasis on the difference between "the Government's role before and after completion of performance on a contract." *Balboa*, 775 F.2d at 1164 (citing *Argonaut Ins. Co. v. United States*, 193 Ct.Cl. 483, 434 F.2d 1362, 1367–68 (1970)). During performance, the court pointed out, the Government's principal interest is in the efficient completion of the contract. *Id.* To that end, federal officials are given broad discretion over the administration of the contract. Importantly, those officials must be free to disburse contract funds to allow the contractor to finance the project to completion. *Id.* It was in this context that the court articulated the eight factors to measure the reasonableness of the Government's conduct before the completion of the contract. After performance, however, the Government's interest in retaining funds to ensure contract completion disappears and the contractor's and surety's interests in the retained funds become paramount. Bluntly put, the Government's inter-

---

**6.** We note in passing that, while defendant asserts the applicability of the *Balboa* decision, its brief fails to explain how that is so. The argument that is offered does not explain why the Government's need for leeway in the management of contract funds during performance—this being the essential thrust of the *Balboa* decision—can or should absolve the Government from its responsibility to direct funds to the addressees named in a properly executed contract modification.

est at this point does not extend beyond avoiding liability for sending the retained funds to the wrong party. *See International Fidelity Ins. Co. v. United States*, 25 Cl.Ct. 469, 477 n. 11 (1992). *Balboa's* "reasonable discretion" framework is inapplicable to the case at bar. For a similar reading of *Balboa*, see *United States Fidelity & Guar. Co. v. United States*, 16 Cl.Ct. 541, 543 (1989).

 In our case, CDC's completed and satisfactory performance supplanted the interest the Government had in the contract funds while the Arnold Avenue project was still ongoing. Satisfactory completion of the work gave the Government what it bargained for: a repaired Arnold Avenue. But the Government still held over $35,000 of contract funds. It was at this point that plaintiff's second letter arrived. Together with the first letter and the contract modification, this second letter afforded adequate notice and warning to the Government and created a stakeholder duty in the Government with respect to the retained funds. The Government's sole duty at this point was to ensure the proper disbursal of the final check. Indeed, P00007 was the administrative acknowledgement of the Government's duty as a stakeholder of final contract funds. A failure to comply with P00007 is tantamount to a breach of this duty. Having failed to follow its own contract modification, and instead erroneously sending the final contract payment to CDC, the Government breached this duty.[7]

 The defendant offers one last argument. Relying on the Supreme Court decision *Brock v. Pierce County*, 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986), for the proposition that the public fisc cannot be compromised by the negligence of a Government agent, defendant argues that since the final payment was negligently mailed to CDC, the Government should not be required to make a second payment.

*Brock* has nothing to do with our situation. The question in that case was whether the Secretary of Labor was barred from recovering federal grant funds paid out to ineligible recipients because the suit for their recovery had not been brought within the statutory time period. Based on an examination of the statutory text and the legislative history, the Court held the Secretary's action to recover misspent funds was not foreclosed on grounds of untimeliness.

 In its discussion of the issue, the Court observed that it had "frequently articulated the 'great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided.' " 476 U.S. at 260, 106 S.Ct. at 1839 (1986) (quoting *United States v. Nashville, C. & St. L.R. Co.*, 118 U.S. 120, 125, 6 S.Ct. 1006, 1008, 30 L.Ed. 81 (1886)). Defendant sees this statement as controlling here. It is not. The protections accorded the Government when acting in its sovereign capacity are to be distinguished from those it may invoke when acting in a proprietary capacity. "[T]he government may suffer loss through the negligence of its officers. If it comes down from its position of sovereignty and enters the domain of commerce, it submits itself to the same laws that govern individuals there." *Cooke v. United States*, 91 U.S. 389, 398, 23 L.Ed. 237 (1875). Clearly, a private party would be liable for causing contract funds to be paid over to one not entitled to them. There is no reason to excuse the Government from such conduct here. Once the Government, either by mistake, *Int'l Fidelity*, or on the strength of an erroneous legal opinion, *Home Indemnity*, or without explanation, *Newark*, distributes contested funds to a party before resolution of the contest, it risks liability for breach of this duty. If it happens that the wrong party received the funds, the Government will be liable. That is the result that follows here.

---

7. In general, to fulfill its duty as stakeholder of retained contract funds, the Government need do no more than execute and adhere to a unilateral contract modification such as P00007. Such a modification, while making no changes in the parties' substantive rights, does accommodate the Government's need to properly disburse the retained funds as well as the surety's desire to protect those funds.

## CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment is granted; defendant's motion to dismiss for lack of jurisdiction and cross-motion for summary judgment are denied. The Clerk shall enter judgment in plaintiff's favor in the amount of $35,376.56.[8]

---

8. In its complaint, plaintiff also asks for pre-judgment interest and attorneys' fees. Interest on a claim against the United States may be allowed only under a contract or an Act of Congress granting the same. 28 U.S.C. § 2516(a) (1992). Neither of these requirements are met here. As to the demand for attorneys' fees, these are recoverable under the criteria set out in the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) (1992). However, plaintiff has not shown that it meets the net worth limitations specified in § 2412(d)(2)(B). Accordingly, we cannot now consider the request for attorneys' fees. The request for attorneys' fees may, however, be renewed after final judgment has been entered.