# ST. PAUL FIRE & MARINE INSURANCE COMPANY *v.* MURRAY GUARD, INC.

99-515                                    37 S.W.3d 180

Supreme Court of Arkansas
Opinion delivered January 18, 2001

352

*Lizabeth Lookadoo* and *Barrett & Deacon,* by: *D.P. Marshall Jr.,* for appellant.

*The Laser Law Firm, P.A.,* by: *Dan F. Bufford* and *Donna L. Gay,* for appellee.

ROBERT L. BROWN, Justice. This appeal presents the issue of whether the doctrine of equitable subrogation applies to a case where appellant St. Paul Fire & Marine Ins. Co. has paid benefits to a third party (the law firm of Wright, Lindsey & Jennings), which is not the insured of St. Paul. We hold that the doctrine does apply under these facts, and we reverse the order of the circuit court granting summary judgment in favor of appellee Murray Guard, Inc., and remand the case for further proceedings.

The facts are these. On January 24, 1994, at about 10:15 p.m., a fire broke out on the fourteenth floor of the Worthen National Bank Building. (Worthen National Bank of Arkansas has since been purchased in succession by Boatmen's National Bank of Arkansas, by NationsBank, N.A., and by Bank of America.) The fire began in the offices of KPMG Peat Marwick and apparently was caused by a space heater under the receptionist's desk at KPMG. As a result of the fire, several floors of the Worthen Bank Building were damaged, including some of the offices of the law firm of Wright, Lindsey and Jennings (hereinafter the Wright Law Firm).

Two lawsuits were filed that resulted from the fire. In 1995, the first lawsuit was filed by KPMG and Worthen Bank, and it alleged that an employee of Laidlaw, Inc., had been negligent in inadvertently turning on the KPMG space heater that caused the fire. The complaint further alleged that the employees of Murray Guard, Inc., a security service, had been negligent in failing to report the "odor of something burning" on the fourteenth floor for two hours or more. Plaintiffs KPMG and Worthen Bank sought damages in the amount of $2,804,834.

On February 23, 1996, St. Paul moved for leave to file a complaint in intervention in the KPMG-Worthen Bank lawsuit. In that motion and the attached complaint in intervention, St. Paul asserted that the Wright Law Firm was covered under an "errors and omissions" policy issued by St. Paul to the Ramsey, Krug, Farrell and Lensing Agency (hereinafter Ramsey Krug) for loss caused by business interruption. Because of an error and omission on the part of Ramsey Krug in not obtaining business interruption insurance for the Wright Law Firm, St. Paul further alleged that it paid the Wright Law Firm $402,671 for business interruption losses and that it was entitled to be equitably subrogated to the rights of the Wright Law Firm against Murray Guard for the money paid.

A second lawsuit was filed by the Wright Law Firm in 1996, and an amended complaint was filed in 1997. In that lawsuit, the Wright Law Firm sued (1) Worthen Bank for failing to have a sprinkler system, adequate fire alarm, or smoke detectors in the area of the fire; (2) KPMG for negligently using a space heater; (3) Laidlaw for inadvertently turning on the space heater and failing to use ordinary care when its employees smelled smoke; and (4) FTTWIC Management, Inc., for negligently managing the build-

ing in terms of fire safety. The suit prayed for damages in the amount of $910,060.10. St. Paul was shown as an intervenor in the Wright Law Firm lawsuit. The Wright Law Firm lawsuit and the Worthen–KPMG lawsuit were consolidated for purposes of trial.

Thereafter, many of the parties involved in the consolidated lawsuits settled in what is termed a global settlement. The salient features of the global settlement for purposes of this appeal are these. The Hartford Insurance Company (hereinafter The Hartford), which insured the Wright Law Firm for property damages and paid it $910,060, received $250,000 on its subrogation claim against the alleged tortfeasors, with the exception of Murray Guard. On June 25, 1998, The Hartford and the Wright Law Firm settled with Murray Guard and released the company from all future liability. The release stated that all subrogation rights of any insurance company had been paid in full. In the global settlement, St. Paul received $60,000 from certain alleged tortfeasors, with the exception of Murray Guard, and released them from future liability.

On July 23, 1998, Murray Guard moved for summary judgment on St. Paul's complaint in intervention in the consolidated lawsuits and cited the release of Murray Guard by The Hartford and the Wright Law Firm in support of its motion. In its brief supporting the motion, Murray Guard asserted that St. Paul's claim to equitable subrogation was invalid because it received no assignment or agreement from the Wright Law Firm to pursue the firm's business interruption claim against Murray Guard. St. Paul responded to the motion and attached affidavits from a recovery specialist and its attorney to the effect that it did not agree to the release of Murray Guard by the Wright Law Firm and was not notified before execution of that release.

On January 7, 1999, the circuit court granted Murray Guard's motion for summary judgment. In the court's ruling from the bench, it stated that it was not basing its ruling on the Wright Law Firm's release but rather on the fact that "every case seems to indicate that the right of subrogation is through the shoes of the insured."

On April 22, 1999, final judgment in Worthen Bank's remaining lawsuit against Murray Guard was entered following a jury trial. In special interrogatories, negligence was apportioned as follows:

Murray Guard 32%; KPMG 21%; Worthen Bank (then NationsBank) 47%. KPMG was awarded $320,000 against Murray Guard for damages and interest. NationsBank was awarded no damages against Murray Guard.

St. Paul appeals the grant of Murray Guard's motion for summary judgment and contends that it made the Wright Law Firm whole for its business interruption loss and, as a result, was entitled to equitable subrogation against Murray Guard which caused the losses by its negligence. We agree.

The critical issue in this case, as we see it, is whether St. Paul is entitled to equitable subrogation when the Wright Law Firm was not its insured but still was paid its business interruption losses by St. Paul under an errors and omissions policy issued to Ramsey Krug. According to Murray Guard, St. Paul cannot be subrogated to the Wright Law Firm's claim because this would result in "two step subrogation" with St. Paul first being subrogated to the rights of its insured, Ramsey Krug, and then, second, to the rights of the Wright Law Firm.

■ By the admission of all parties, this is a novel question for Arkansas, and we turn first to an analysis of the general principles of the doctrine of equitable subrogation and next to cases that are apposite. In *Hunter v. Jennings*, 216 Ark. 886, 227 S.W.2d 946 (1950), this court set out general principles related to subrogation:

> As a general rule any person who, pursuant to a legal obligation to do so, has paid even indirectly for a loss or injury resulting from the wrong or default of another, will be subrogated to the rights of the creditor or injured person against the wrongdoer or defaulter.
>
> ....
>
> Subrogation, an equitable doctrine taken from the civil law, is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter, so long as the payment was made either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability.

216 Ark. at 888-889, 227 S.W.2d at 947-948 (*quoting Home Ins. Co. v. Lack*, 196 Ark. 888, 120 S.W.2d 355 (1938); *Gerseta Corp. v.*

*Equitable Trust Co. of New York,* 241 N.Y. 418, 150 N.E. 501 (1926)). Under subrogation, the payor who is the subrogee steps into the shoes of the payee and becomes subrogated to whatever rights the payee had against a wrongdoer.

■ This court has said that subrogation is an equitable remedy that rests upon principles of unjust enrichment and attempts to accomplish complete and perfect justice among the parties. *Blackford v. Dickey,* 302 Ark. 261, 789 S.W.2d 445 (1990); *Baker v. Leigh,* 238 Ark. 918, 385 S.W.2d 790 (1965). We have further said that the elements of subrogation are as follows:

> 1) a party pays in full a debt or an obligation of another or removes an incumbrance of another, 2) for which the other is primarily liable, 3) although the party is not technically bound to do so, 4) in order to protect his own secondary rights, to fulfill a contractual obligation, or to comply with the request of the original debtor, 5) without acting as a volunteer or an intermeddler.

*Blackford v. Dickey, supra.* Finally, we have said that subrogation is a doctrine of equity governed by equitable principles. *Cooper Tire & Rubber Co. v. Northwestern National Cas. Co.,* 268 Ark. 334, 595 S.W.2d 938 (1980); *Federal Land Bank of St. Louis v. Richland Farming Co.,* 180 Ark. 442, 21 S.W.2d 954 (1929). The doctrine is deeply rooted and flexible and extends as far as needed to do justice. *American Surety Co. v. Vann,,* 135 Ark. 291, 205 S.W. 646 (1918). The doctrine has as its basis the doing of complete and perfect justice between the parties without regard to form. *Newberry v. Scruggs,* 336 Ark. 570, 986 S.W.2d 853 (1999).

■ There are two kinds of subrogation known to the law: conventional subrogation and equitable subrogation. 73 AM. JUR.2d *Subrogation* § 2 (1974).[1] Equitable subrogation is given a liberal application and is broad enough to include every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which that other party should have paid. 73 AM. JUR.2d *Subrogation* § 14 (1974). Conventional subrogation, on the other hand, is founded on some understanding or agreement. 73 AM. JUR.2d *Subrogation* § 9 (1974).

---

[1] Equitable subrogation is sometimes referred to as legal subrogation.

In the case before us, St. Paul invokes the doctrine of equitable subrogation, which requires no writing or agreement in most instances. St. Paul advances the proposition that its direct payment of the business interruption losses to the Wright Law Firm fits squarely within the equitable subrogation principle and entitles it to relief against Murray Guard, which was primarily responsible for the loss. St. Paul further maintains that it paid the loss in full to the Wright Law Firm and did so because it was obligated under its "errors and omissions" coverage with Ramsey Krug and did not act as a volunteer. Furthermore, it contends that if Murray Guard is not held accountable by St. Paul, Murray Guard will receive a windfall in terms of totally avoiding liability for the Wright Law Firm's damages caused by business interruption.

Murray Guard, on the other hand, claims that even though St. Paul paid the Wright Law Firm, it was not obligated to do so by contract and that St. Paul's duty was owed only to its insured, Ramsey Krug. Thus, according to Murray Guard, St. Paul's rights against Murray Guard are limited to whatever rights Ramsey Krug had against the security firm. Murray Guard urges that to hold otherwise would give St. Paul a potential windfall against Murray Guard because it was paid premiums for the "errors and omissions" coverage.

■■ We will address the last point first. This court has made it clear that the receipt of premiums does not militate against an insurance company's entitlement to subrogation. *Page v. Scott*, 263 Ark. 684, 567 S.W.2d 101 (1978). In *Page*, we said that that argument could be mounted against any insurer seeking recovery under a subrogation theory, and we added that we had never recognized the validity of such an argument. Furthermore, the prominent question in equitable subrogation is whether payment was made by the subrogee to the wronged party as opposed to whether a direct contractual relationship existed between the payor and the payee. In the case before us, St. Paul paid the business interruption loss directly to the Wright Law Firm, as it was obligated to do under its insurance contract with Ramsey Krug.

Both parties readily admit that there is a dearth of authority for deciding this case. Nevertheless, the authority that does exist favors the position of St. Paul. *See American Surety Co. v. Vann, supra; Zannini v. Reliance Ins. Co. of Illinois*, 147 Ill.2d 437, 590 N.E.2d 457

(1992); *Shelby Mutual Ins. Co. v. Clark-Homes, Inc.*, 414 S.W.2d 650 (Tenn. Ct. App. 1966). In *American Surety Co. v. Vann*, the guardian of the estate of minor wards used the wards' money to buy a car for himself from a car dealer. The car dealer knew that the guardian was using the wards' money but sold him the car anyway. The guardian's misdeed was discovered, and the surety company for its principal, the guardian, paid the wards' estate what it had lost. The surety then sued the car dealer under the doctrine of equitable subrogation because the car dealer knowingly participated in the misappropriation of the wards' funds. This court held that equitable subrogation applied. We further concluded that because the car dealer participated in the conversion, the car dealer was liable to the surety for the money received from the guardian. In short, we approved the ability of the surety to assert the claim of the wards, who it had paid for the loss caused in part by the car dealer. We did so even though the surety was not standing in the shoes of its principal, who was the guardian, in bringing the suit but rather in the shoes of the wards who it had paid. In the case before us, St. Paul was also not asserting subrogation on behalf of an insured or principal but rather on behalf of the Wright Law Firm which it paid under its contract with Ramsey Krug.

The case of *Zannini v. Reliance Insurance Co. of Illinois, supra,* involved an insured, Zannini, who filed a claim against Reliance Insurance Co. for the loss of certain jewelry by theft. Reliance Insurance denied the claim and asserted that Zannini did not have coverage because Nesslar, Zannini's agent, had failed to procure the necessary coverage. Zannini then filed an amended complaint and alleged that a second insurance company (Employers Reinsurance Corp.), should pay the claim as the carrier of Nesslar's errors and omissions policy. Employers Reinsurance did so. Employers Reinsurance then joined as a plaintiff with Zannini in the suit against Reliance Insurance. The main issue was whether Nesslar was acting as an agent of Zannini, so as to be personally liable for the loss, or acting as an agent of Reliance Insurance Co., so as to bind the insurance company on the policy. The trial court found that Nesslar was the agent of Zannini. In reversing, the Illinois Supreme Court held that Nesslar had the power as the agent of Reliance Insurance Co. to bind the company. Thus, the court held that Reliance Insurance Co. was liable for this claim. The pertinent point for purposes of our case was that Employers Reinsurance,

which paid Zannini under the errors and admissions issued to the agent, was subrogated to the rights of Zannini for purposes of its litigation against Reliance Insurance.

Finally, in *Shelby Mutual Ins. Co. v. Clark-Holmes, Inc., supra,* the employer had insurance for workers' compensation coverage through its carrier, Shelby Mutual. Shelby Mutual refused to pay a workers' compensation claim of an employee because it contended that an agent had not properly bound the coverage. Michigan Miller Mutual Insurance Co. stepped in as the errors and omissions carrier for the agent and paid the workers' compensation claim. The employer then sued Shelby Mutual on behalf of Michigan Miller and the agent and claimed that the plaintiffs were entitled to be reimbursed for the amount paid to discharge the employer's workers' compensation liability. The trial court agreed. On appeal, Shelby Mutual argued that the trial court erred in allowing subrogation rights to the agent and his errors and omissions carrier. The Tennessee Court of Appeals disagreed, however, and stated that "it seems equitable and just that defendant [Shelby Mutual] be required to pay to them [the employer and employee] what it should have paid to [the employer], or its injured employee. Otherwise, defendant would profit by its own wrong in violating its contract." *Shelby Mutual Ins. Co.,* 414 S.W.2d at 655. The opinion goes on to discuss the doctrine of subrogation as it applies according to the dictates of equity and good conscience and consideration of public policy. The court cited to *Dixon v. Morgan,* 285 S.W. 558, 560 (Tenn. 1926), for the statement that "[subrogation] will be allowed in all cases where the equities of the case demand it. It rests upon the maxim that no one shall be enriched by another's loss, and may be invoked wherever justice demands its application[.]" *Id.,* 414 S.W.2d at 655. Similarly, in the instant case, St. Paul seeks payment from the alleged wrongdoer as a result of paying the Wright Law Firm its business interruption loss under an errors and omissions policy.

■ Hence, in all three cases discussed above the payor of benefits to a wronged party, rather than its insured or principal, was subrogated to the rights of the payee against the alleged wrongdoer. That, of course, is the issue presented to us in the instant case. The trial court erred in refusing to allow St. Paul to enforce its right to equitable subrogation under the facts of this case, and we reverse on this point.

■ There is one additional matter, however. In its brief, Murray Guard appears to abandon the argument that the settlement between Murray Guard and the Wright Law Firm vitiates any subrogation claim by St. Paul. At oral argument, Murray Guard's counsel stated:

> I want to discuss for just a moment the settlement that was raised by Mr. Marshall. We don't assert it on appeal as a basis for why St. Paul can't recover. He is correct on that and that is clear in our brief. I think Judge Piazza was correct not to rely on that, but the settlement is of great significance here.[2]

Counsel then posited at oral argument that St. Paul cannot be subrogated to a claim that has been *released* by the Wright Law Firm. St. Paul, according to affidavits filed in response to the summary-judgment motion, never agreed to the settlement or release and had no notice of either. St. Paul underscores in its brief that notice to a subrogee of a release is essential to any contention that the release is effective against the subrogee and cites us to *Daves v. Hartford Accident and Indemnity Co.*, 302 Ark. 242, 788 S.W.2d 733 (1990); *Floyd v. Home Ins. Co.*, 250 Ark. 915, 467 S.W.2d 698 (1971); and *Sentry Ins. Co. v. Stuart*, 246 Ark. 680, 439 S.W.2d 797 (1969). Clearly, the settlement and release were not a basis for the trial court's summary-judgment order. Though Murray Guard's position on the effect of the settlement and release in this appeal is somewhat ambiguous, we take the appellee at its word and do not consider the settlement or release between Murray Guard and the Wright Law Firm to be a separate issue in this appeal. We, therefore, refrain from addressing this point.

We reverse the order of summary judgment and remand this case for further proceedings. We acknowledge that St. Paul requests that we apply the percentage of Murray Guard's liability (32%) determined at trial against its subrogation of $402,671 less the $60,000 received in the global settlement. That action would be premature on the part of this court and is a matter for the trial court's consideration and determination.

Reversed and remanded.

---

[2] The trial court specifically agreed that it was not relying on the *release* in its decision.

GLAZE and IMBER, JJ., not participating.

SPECIAL JUSTICE JOSEPH P. MAZZANTI, III, and SPECIAL JUSTICE FRANK H. BAILEY join in this opinion.