# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-3600

_____

| | | |
|---|---|---|
| Pennsylvania National Mutual Casualty Insurance Company, a Pennsylvania Corporation, | * * * * | |
| Plaintiff/Appellant, | * * | |
| Cannon Contracting, Inc., | * * | |
| Intervenor Plaintiff, | * * | Appeal from the United States District Court for the |
| v. | * * | Eastern District of Arkansas. |
| City of Pine Bluff, | * * | |
| Defendant/Appellee, | * * | |
| David Mitchell Construction, Inc.; David R. Mitchell; Theresa Mitchell; Karl F. Dix, Jr.; Pine Bluff National Bank; Nobel Insurance Company, | * * * * * * | |
| Defendants. | * * | |
| _____ | * * | |
| Surety Association of America, | * * | |
| Amicus on Behalf of Appellant. | * * | |

_____

No. 02-3646
_____

Pennsylvania National Mutual          *
Casualty Insurance Company, a         *
Pennsylvania Corporation,             *
                                      *
              Plaintiff,              *
                                      *
Cannon Contracting, Inc.,             *
                                      *
              Intervenor Plaintiff/   *
              Appellant,              *
                                      *
       v.                             *
                                      *
City of Pine Bluff,                   *
                                      *
              Defendant/Appellee,     *
                                      *
David Mitchell Construction, Inc.;    *
David R. Mitchell; Theresa            *
Mitchell; Karl F. Dix, Jr.; Pine Bluff *
National Bank; Nobel Insurance        *
Company,                              *
                                      *
              Defendants.             *


_____

No. 02-3735
_____

Pennsylvania National Mutual          *
Casualty Insurance Company, a         *

Pennsylvania Corporation,                 *
                                          *
            Plaintiff/Appellee,           *
                                          *
Cannon Contracting, Inc.,                 *
                                          *
            Intervenor Plaintiff/         *
            Appellee,                     *
                                          *
      v.                                  *
                                          *
City of Pine Bluff,                       *
                                          *
            Defendant/Appellant,          *
                                          *
David Mitchell Construction, Inc.;        *
David R. Mitchell; Theresa                *
Mitchell; Karl F. Dix, Jr.; Pine Bluff    *
National Bank; Nobel Insurance            *
Company,                                  *
                                          *
            Defendants.                   *
_____                    *
                                          *
Surety Association of America,            *
                                          *
            Amicus on Behalf of           *
            Appellee.                     *

                         _____

            Submitted:   September 8, 2003

                Filed:   January 15, 2004
                         _____

Before WOLLMAN, BOWMAN, and RILEY, Circuit Judges.
                         _____

-3-

WOLLMAN, Circuit Judge.

In this suretyship case, the City of Pine Bluff, Arkansas (City), and Pennsylvania National Mutual Casualty Insurance Company (Penn National) cross-appeal the district court's findings regarding the contours of equitable subrogation, suretyship, and municipal immunity in Arkansas. We conclude that the City must reimburse Penn National for the losses it suffered after the City released funds to a general contractor despite notice of the general contractor's default and a request from the surety to withhold funds pending investigation. We therefore reverse and remand with directions to enter judgment for Penn National.

I.

After severe ice storms littered Pine Bluff with debris in December 2000, the City applied for Federal Emergency Management Agency (FEMA) funds and hired general contractor David Mitchell Construction (Mitchell) to clean up the aftermath. The contract required that the City withhold ten percent of any progress payments to Mitchell as retainage,[1] and Mitchell agreed to pass on payment to subcontractors working on the project within ten days of any progress payment from the City. Acting as surety, Penn National underwrote a combined performance and payment bond for the project in the penal sum of $3.5 million.[2]

---

[1]Retainage is "[a] percentage of what a landowner pays a contractor, withheld until the construction has been satisfactorily completed . . . ." Blacks Law Dictionary 1317 (7th Ed. 1999).

[2]Often issued in conjunction, performance and payment bonds are usually required in public works projects. See, e.g., 40 U.S.C. § 3131(b) (West 2003); cf. Ark. Code Ann. § 22-9-401 (Michie 1996). A performance bond protects the owner, or obligee, ensuring project completion if the general contractor defaults. In re Modular Structures, Inc., 27 F.3d 72, 74 n. 1 (3d Cir. 1994); Int'l Fidelity Ins. Co. v. United States, 41 Fed. Cl. 706, 708 n. 2 (1998). A payment bond ensures that laborers and material suppliers will be paid if the general contractor defaults. Int'l Fidelity Ins.

-4-

As the work progressed, Mitchell and the City began arguing over pricing and Mitchell's hauling of debris allegedly ineligible for FEMA reimbursement. On March 26, 2001, the City terminated its contract with Mitchell and arranged for City employees to complete the work – actions Penn National did not discover until approximately June 5, 2001. On that date, the City returned to Penn National a completed status inquiry form indicating that the contract had been terminated and that the final contract price was "disputed." The form also contained a notation that the City had received some $2.8 million in claims from unpaid subcontractors supplying labor and materials on the project.

By letter dated June 15, 2001, Penn National requested that the City not release any funds allocated to the project without Penn National's written consent. The letter stated that Penn National was investigating unpaid subcontractor claims and asserted potential subrogation rights to contract funds. Despite the letter, however, the Pine Bluff City Council approved a settlement and release with Mitchell a few days later, paying Mitchell and Mitchell's creditors approximately $2 million.[3] Although the record does not indicate whether this amount included FEMA monies the City received prior to Penn National's June 15 letter, the City later received FEMA payments totaling approximately $1.8 million. Dist. Ct. Order of Sept. 24, 2002 at 4.

---

Co., 41 Fed. Cl. at 708 n. 2; R.J. Bob Jones Excavating Contractor, Inc. v. Firemen's Ins. Co., 920 S.W.2d 483, 486 (Ark. 1996).

[3]The City released $997,435.90 to Mitchell, $512,191.81 to Pine Bluff National Bank, which had loaned money to Mitchell, and $465,752.03 to the Chancery Court of Jefferson County to satisfy one of Mitchell's judgment creditors.

Penn National brought suit against the City and others, originally seeking a declaratory judgment and a bill *quia timet*.[4] Various unpaid subcontractors also intervened in the litigation or instituted separate suit against Penn National on the payment bond. Penn National then investigated the various subcontractor claims as litigation progressed.

Penn National ultimately determined that two subcontractors, Rental Service Corporation (Rental) and Cannon Contracting (Cannon), possessed valid bond claims. Penn National settled with each, albeit in different ways. Rental originally alleged claims totaling $204,492.24, but accepted an unconditional payment of $165,000.00 in full settlement. Cannon originally claimed an unpaid balance of $669,869.93, but accepted an unconditional payment of $400,000.00 plus an escrowed $269,869.93, the release of which is conditioned on Penn National's success in this lawsuit.[5] In return, both Rental and Cannon expressly assigned their rights to Penn National.

Penn National then sought to amend its complaint against the City to include requests for declaratory and equitable relief, including equitable subrogation. After consolidating related cases, the district court permitted amendment and simultaneously considered the parties' motions for summary judgment. In sum, the district court rejected the City's contention that it was immune from suit and concluded that equitable subrogation did not furnish Penn National with actionable rights against the City.

---

[4]Literally meaning "because he fears," *quia timet* is "[a] legal doctrine that allows a person to seek equitable relief from a future probable harm to a specific right or interest." Blacks Law Dictionary 1260 (7th Ed. 1999).

[5]If Penn National prevails, Cannon will receive the escrowed money in an amount equaling whatever Penn National recovers beyond $400,000, up to the full $269,869.93, plus half of any award greater than $669,869.93. If Penn National's suit is unsuccessful or does not recover more than $400,000, however, the escrowed money will be returned to Penn National.

II.

We review the district court's summary judgment rulings de novo, <u>Evergreen Invs., LLC v. FCL Graphics, Inc.</u>, 334 F.3d 750, 753 (8th Cir. 2003), and Arkansas substantive law governs that inquiry. <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938); <u>United Fire & Cas. Ins. Co. v. Garvey</u>, 328 F.3d 411, 413 (8th Cir. 2003). Before reaching the merits, however, we must consider two threshold arguments.

The City initially contends that Penn National never requested "damages" and has therefore waived any request for monetary relief. We reject this argument because a liberal reading of the amended complaint and a survey of the parties' arguments before the district court reveals that Penn National was pursuing, *inter alia*, recovery from municipal pockets. <u>See</u> Fed. R. Civ. P. 8(a); <u>Conley v. Gibson</u>, 355 U.S. 41, 47-48 (1957). Given that the City has consistently argued its immunity from damages, it is difficult to understand how the City can now claim lack of notice regarding Penn National's request or prejudice arising therefrom.

The City also mentions the election-of-remedies rule, asserting that Penn National's request for a declaration of priority to contract funds and to recover the funds from others is necessarily repugnant to a recovery from City coffers. Once again, we cannot fathom why. Designed to prevent double recovery for a single injury, <u>Smart v. Sunshine Potato Flakes, L.L.C.</u> 307 F.3d 684, 686 (8th Cir. 2002), the election-of-remedies rule applies when a party possesses two appropriate but inconsistent remedies and deliberately pursues one remedy to the other's exclusion. <u>Van Curen v. Ark. Prof'l Bail Bondsman Licensing Bd.</u>, 84 S.W.3d 47, 58 (Ark. App. 2002). The rule does not prohibit assertion of multiple causes of action, <u>Sexton Law Firm, P.A. v. Milligan</u>, 948 S.W.2d 388, 395 (Ark. 1997), nor does it preclude pursuit of consistent remedies, even to final adjudication, so long as the plaintiff receives but one satisfaction. <u>Kapp v. Bob Sullivan Chevrolet Co.</u>, 335 S.W.2d 819, 821 (Ark. 1960). Here, the City's contention that Penn National elected only a

declaratory remedy is misplaced because Penn National also requested equitable subrogation and sought recovery of specified funds. Seeking a declaration of priority to funds and pursuing judgment in an equal amount reflects no assertion of inconsistent remedies. To establish that the City paid the wrong party and should be liable, the court must first conclude that Penn National was entitled to priority payment.

We next consider the contours of equitable subrogation in suretyship. Equitable subrogation is one of a surety's principal mechanisms for reducing loss. See Prairie State Bank v. United States, 164 U.S. 227, 231 (1896) (recognizing surety's subrogation rights as "elementary."). Arising by operation of law, the doctrine permits the surety to acquire and assert the rights of those parties whom the surety pays. Welch Foods, Inc. v. Chicago Title Ins. Co., 17 S.W.3d 467, 470 (Ark. 2000).

A prerequisite to equitable subrogation is the surety's full satisfaction of any underlying debt or obligation. American Sur. Co. of New York v. Westinghouse Elec. Mfg. Co., 296 U.S. 133, 137 (1935); St. Paul Fire & Marine Ins. Co. v. Murray Guard, Inc., 37 S.W.3d 180, 183 (Ark. 2001). The parties here dispute whether Penn National's settlement with Cannon satisfies this requirement because the settlement involves a partially conditional payment. The district court thought the conditional payment presented a "bootstrapping" problem and concluded that Penn National had not fully satisfied Cannon's claim, but we disagree.

As noted by Justice Cardozo, full satisfaction is necessary because, "[i]f the holding were different, the surety would reduce the protection of the bond to the extent of its dividend in the assets of the debtor." American Sur. Co., 296 U.S. at 137. Full satisfaction also prevents competition between the rights of the surety and the original creditor to the original creditor's detriment: "[U]ntil the creditor be wholly satisfied, there ought to and can be no interference with his rights or his securities

which might, even by bare possibility, prejudice or embarrass him in any way in the collection of the residue of his claim." Barton v. Matthews, 216 S.W. 693, 694 (Ark. 1919) (internal quotation omitted); cf. Restatement (Third) of Suretyship and Guaranty § 27 cmt. b.

In this case, the debris-removal contract and associated bond created two relevant obligations: removal of specified debris and payment for labor and materials. The City unilaterally removed the former obligation, so Penn National was charged with satisfying the latter under its payment bond – an event which has occurred. Mitchell and the City owe nothing to Rental and Cannon by virtue of the subcontractors' settlement with Penn National. Despite Cannon's derivative interest in this lawsuit, Cannon does not possess any remaining claim for "residue" against Mitchell or the City and there is no risk of competition between Penn National's rights and Cannon's rights arising from the same undivided interest.

As an intended beneficiary of the payment bond, Cannon was free to reject a partially conditional payment and further litigate its rights under the bond. It instead chose to avoid further litigation – and any potential defenses possessed by Penn National – for a certain $400,000 plus the added risk of an uncertain interest in Penn National's lawsuit with the possible reward of monies beyond $669,869.93.[6]  This, we think, was its contractual prerogative, and if Cannon was satisfied to accept it as full payment, so are we.  After settlement with Penn National, Cannon cannot (and does not) "complain that . . . [Penn National's] subrogation makes its position less

_____

[6]As indicated in footnote 5, supra, the settlement provides that Cannon will receive half of any recovered amount beyond $669,869.93.  Our analysis might be different if the subcontractor received no negotiated benefit beyond its initial claim, in which case the surety would have merely placed its interest in reimbursement ahead of the subcontractor's right to payment – a situation contrary to the point of a payment bond and suretyship generally.

favorable than it would have been . . . ." Southern Cotton Oil Co. v. Napoleon Hill Cotton Co., 158 S.W. 1082, 1084 (Ark. 1913).

In Arkansas, as elsewhere, when a surety completes work or pays laborers and material suppliers, equitable subrogation permits the surety to proceed against retainage and remaining contract funds for reimbursement. Equilease Corp. v. United States Fid. & Guar. Co., 565 S.W.2d 125, 126 (Ark. 1978); Pearlman v. Reliance Ins. Co., 371 U.S. 132, 139 (1962) ("[T]he same equitable rules as to subrogation . . . exist whether a surety completes a contract or whether, though not called upon to complete the contract, it pays the laborers and materialmen."). The surety's right to these monies is typically superior to the rights of the general contractor's assignees or estate in bankruptcy because the surety's rights vest upon "full satisfaction for default and relate back to the time the bond or contract of suretyship was entered into." Equilease Corp., 565 S.W.2d at 126 (citation omitted); Restatement (Third) of Suretyship and Guaranty § 31(b). Thus, if the City were still holding retainage or contract funds, extant Arkansas law would provide for Penn National's reimbursement, and Penn National would be entitled to priority over Mitchell and Mitchell's creditors.

The City promptly settled with and disbursed money to Mitchell, however, so a finding that Penn National would have otherwise been entitled to withheld funds through equitable subrogation is only part of the story. The district court aptly observed that "[t]here is precious little Arkansas law which sheds light on what happens when a government entity with notice from a surety that there may be outstanding claims on the bond, ignores the notice and disburses the funds to the [general] contractor and his creditor." D. Ct. Order of Sept. 24, 2002, at 15. We think this statement defines the issue well, and, absent controlling state authority, our obligation is to predict how the Arkansas Supreme Court would rule on the issue. See Smith v. Chemical Leaman Tank Lines, Inc., 285 F.3d 750, 754 (8th Cir. 2002).

Penn National urges us to apply a series of federal decisions which support the proposition that a bond obligee may not increase the surety's risk or otherwise undermine the surety's subrogation rights. See e.g., Nat'l Sur. Corp. v. United States, 118 F.3d 1542, 1544-46 (Fed. Cir. 1997); Transamerica Premier Ins. Co. v. United States, 32 Fed. Cl. 308, 313-14 (1994) (Transamerica); Home Indem. Co. v. United States, 376 F.2d 890, 892-93 (Ct. Cl. 1967). Although no Arkansas decision covers these precise facts, we believe that the Arkansas Supreme Court would steer a course consistent with federal decisions. See Seaboard Sur. Co. v. First Nat'l Bank & Trust Co., 121 F.2d 288, 291 (8th Cir. 1941) (predicting, in absence of state authority, that South Dakota would follow federal cases regarding surety priority).

In contracts for services that include payment in installments or upon completion, unearned progress payments and retainage are security, or collateral, ensuring discharge of the obligations created by the underlying contract. Restatement (Third) of Suretyship and Guaranty § 31 cmt. a; Transamerica, 32 Fed. Cl. at 313. Moreover, "[t]he surety bond embodies the principle that any material change in the bonded contract, that increases the surety's risk or obligation without the surety's consent, affects the surety relationship." Nat'l Sur. Corp., 118 F.3d at 1544; Hawkins v. Mims, 36 Ark. 145, 1880 WL 1599, at *2 (1880) ("Of course, if the obligee releases any of his securities, or enters into a new contract with the principal, varying the terms of the original agreement . . . the non-assenting surety will be discharged, for such acts increase the surety's risk."). By settling with the general contractor and releasing payments and retainage before they are due or not due at all, the obligee increases the surety's risk and impairs the surety's ability to be made whole through subrogation if the surety is later called upon to discharge the underlying obligation. Restatement (Third) of Suretyship and Guaranty § 31 cmt. c; see also Kurrus v. Priest, 29 S.W.3d 669, 676 (Ark. 2000) ("[W]here collateral which has been pledged to secure the repayment of bonds is removed, then the obligation of the contract between the bondholder and the bond issuer has been impaired"); Myers v. First State Bank,

732 S.W.2d 459, 461 (Ark. 1987) (Under Arkansas general suretyship law, a creditor must preserve a surety's right of recourse in collateral.).

These principles, considered with the equitable rights of laborers and material suppliers (and therefore the subrogated surety) to payment from remaining funds, have led federal courts to recognize the obligee's duty as a "stakeholder" to ensure proper application of collateral (contract funds and retainages) upon appropriate notice of the general contractor's default. See Transamerica, 32 Fed. Cl. at 314; Int'l Fid. Ins. Co. v. United States, 25 Cl. Ct. 469, 477 (1992); Home Indem. Corp., 376 F.2d at 894. Indeed, "the entire doctrine of subrogation in suretyship is dependent upon the immediate investment of the creditor with the obligations of a trustee whenever any rights or interests of the debtor, applicable to the debt, are placed in his control . . . ." Arthur Adelbert Stearns, The Law of Suretyship §6.46 (James L. Elder, ed., 5th Ed. 1951). If, after appropriate notice of default, the government chooses to pay funds to the general contractor that are or become equitably owed to the surety, the government is liable for the actual loss visited upon the surety. Nat'l Sur. Corp., 118 F.3d at 1548; Transamerica, 32 Fed. Cl. at 314; Restatement (Third) of Suretyship and Guaranty § 31 cmt. c.

Here, faced with conflicting claims by the general contractor, the unpaid subcontractors, and the surety, the City decided to pay Mitchell despite premature termination of the contract, knowledge of Mitchell's default, and notice from the surety to preserve remaining security. The City incorrectly chose Mitchell over the superior equitable claims of the unpaid subcontractors whose work earned the contract funds in the first place. Because Penn National was independently obligated to satisfy subcontractor claims under the payment bond, see R.J. Bob Jones Excavating Contractor, Inc. v. Firemen's Ins. Co., 920 S.W.2d 483, 486 (Ark. 1996), the City's decision to settle with Mitchell increased Penn National's risk and impaired its right to reimbursement from remaining security. The City is accordingly liable for

Penn National's actual loss.  Nat'l Sur. Corp., 118 F.3d at 1548; Restatement (Third) of Suretyship and Guaranty § 37(4).

Having concluded that the City must reimburse Penn National, we address the City's cross-appeal, in which the City asserts that it is immune from liability because Penn National's suit is one sounding in tort.  In Arkansas, municipal corporations are subject to suit in contract, Bankston v. Pulaski County Sch. Dist., 665 S.W.2d 859, 862 (Ark. 1984), and for intentional torts, Battle v. Harris, 766 S.W.2d 431, 433 (Ark. 1989), but not for negligence unless the City carries liability insurance covering the particular negligent act.  See Ark. Code. Ann. §21-9-301 (Michie 1996) (stating municipalities are "immune from liability and from suit for damages . . . ."); Caddo Valley v. George,  9 S.W.3d 481, 484 (Ark. 2000) ("[A] municipal corporation's immunity for negligent acts only begins where its insurance coverage leaves off."). There is no evidence here that the City carries liability insurance covering Penn National's suit, and the City focuses on Penn National's assertion that the City breached its duty as a stakeholder by making a "wrongful" payment to Mitchell.  The City contends that this language and the deposition testimony of Penn National's designated corporate representative make clear that Penn National's claim is really a negligence claim, from which the City is immune.  We disagree.

Although Penn National does claim that the City breached a duty, the duty is more appropriately viewed as one arising from contract and equity.  Bonds are contracts, and suretyship status is created through a triparite agreement "whereby one party (the surety) becomes liable for the principal's or obligor's debt or duty to the third party obligee." Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160 (Fed. Cir. 1985). Thus, when the surety performs the underlying obligation by completing work or paying subcontractors, the surety fulfills not only its contractual obligation under the bond but also the general contractor's contractual duties to the obligee and to subcontractors.  Likewise, the right of subcontractors and the subrogated surety to be paid from funds held by the obligee arises in equity.  Sureties bond projects with

-13-

these rights in mind and with the legitimate expectation that the security ensuring discharge of the underlying obligation will be properly applied. The obligee's ultimate failure to properly apply that security is thus not a tort. Cf. Bankston, 665 S.W.2d at 862 (finding that a school district was not immune from a suit for breach of implied warranty involving defects in the sewer system of a home built by students as a vocational project). "Clearly, a private party would be liable for causing contract funds to be paid over to one not entitled to them. There is no reason to excuse the [City] from such conduct here." Transamerica, 32 Fed. Cl. at 316.

The judgment is reversed, and the case is remanded to the district court with directions to enter a judgment in favor of Penn National consistent with the views set forth in this opinion.

RILEY, Circuit Judge, concurring.

Although I agree with the court's decision, I concur to express two concerns: first, our imposition of federal equitable subrogation principles which may not comport with how Arkansas courts would necessarily decide this case; and second, our reversal of a respected Arkansas federal judge, who is more familiar with Arkansas legal practices than we are. Nevertheless, I am convinced we reach a just result.

Given the lack of Arkansas precedent addressing the application of equitable subrogation against a stakeholder in the City's position, it is reasonable for this court to anticipate Arkansas courts would utilize analogous precedent from the United States Court of Federal Claims.[7] We can take comfort in the Arkansas Supreme

---

[7]See, e.g., Transamerica Premier Ins. Co. v. United States, 32 Fed. Cl. 308, 313-14 (1994); Newark Ins. Co. v. United States, 169 F. Supp. 955, 957 (Ct. Cl. 1959) ("Surely a stakeholder, caught in the middle between two competing claimants, cannot, in effect, decide the merits of their claims by the mere physical act of

Court's repeated assurances that equity and justice are at the heart of equitable subrogation. See, e.g., St. Paul Fire & Marine Ins. Co. v. Murray Guard, Inc., 37 S.W.3d 180, 183 (Ark. 2001) ("The [equitable subrogation] doctrine is deeply rooted and flexible and extends as far as needed to do justice. The doctrine has as its basis the doing of complete and perfect justice between the parties without regard to form. . . . Equitable subrogation is given a liberal application and is broad enough to include every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which that other party should have paid.") (citations omitted); Fed. Land Bank of St. Louis v. Richland Farming Co., 21 S.W.2d 954, 955 (Ark. 1929) ("[A]s the doctrine of subrogation was evolved by courts of equity for the prevention of injustice, it is administered not as a legal right, but the principle is applied to subserve the ends of justice and to do equity in the particular case before the court. Therefore no rule can be laid down for its universal application, and whether it is applicable or not depends upon the particular facts and circumstances of each case as it arises."); see also Welch Foods, Inc. v. Chicago Title Ins. Co., 17 S.W.3d 467, 470 (Ark. 2000) (Smith, J. Lavenski R.) ("Subrogation is a doctrine steeped in equity and generally governed by equitable principles.").

The equities in this case clearly favor Penn National, not the City or Mitchell. The City, as stakeholder of the disputed funds, should have retained those funds for the protection of the unpaid subcontractors and the vulnerable surety. I am confident our decision is not an affront to Arkansas law. Rather, our decision is a good-faith endeavor to reach the just result Arkansas courts would have reached if faced with the same equities.

_____

_____

delivering the stake to one of them. . . . If it is made to appear that the Government's officials, after due notice of the facts giving rise to an equitable right in the plaintiff surety company, and of the plaintiff's assertion of such a right, paid out, without a valid reason for so doing, the money in question to someone other than the plaintiff, the plaintiff will be entitled to a judgment.").